## STATEMENT OF FACTS

Janice LaPenna had taught Physical Education in the Hartford Public Schools ("HPS") for

over twenty-five years in August, 2000, and had been an athletic coach for more than fourteen.  She

had taught at her alma mater, Hartford Public High School (HPHS), for many years.  In 1996, she

became the Faculty Manager ("FM") for HPHS.  In that position, plaintiff earned approximately

$10,000.00 per year in addition to her teaching salary.  She received outstanding evaluations.[1]  In

August, 2000, HPS transferred her to an elementary school, removed her from the FM position in the

midst of a two-year contract, and replaced her with David Hodge, a male fifteen years younger.

GIMF 13p; 5a, 9c, d;  11a; 12a, b.  Defendants have given a series of false, contradictory and illogical

statements about who made the decisions, and the reasons why HPS transferred her and removed her

from the FM position after years of outstanding performance at HPHS.  GIMF 1a-m; 2a-j; 7a-e; 8a-c;

5a-b; 6a. Defendants assert there was just cause to remove her as FM because they transferred her

teaching assignment.  At the same time, they transferred Hodge to HPHS.  GIMF 6a, 13a, c; 11e.

Dr. Jose Colon-Rivas ("Colon") became Principal of HPHS in July, 2000.  HPS developed a

list of HPHS teachers to transfer out of the school, and plaintiff was on the list.  Dr. Colon, who

swears he always told the truth, made specific and clear statements at the time, as to who decided to

transfer plaintiff out of HPHS, and why.  Colon met with plaintiff and told her it was not he, but

---

[1]

Throughout this Memorandum, plaintiff will cite to her Local Rule 56(a)2 Statement, Section B,
Genuine Issues of Material Fact ("GIMF"), where she has documented each fact with testimony and
affidavits.  These facts are supported at GIMF 2g.

someone "downtown," at the central offices of HPS who decided to transfer her.  He told her that <u>her mouth had gotten her in trouble, and she had made an enemy of someone</u>.  He did not say that former principal Joseph Wall suggested she be transferred, or she was labeled  "not a team player."  But after he met her, Colon was so impressed he told her he would get the transfer rescinded.  GIMF 1b-f.

Dr. Colon also met with the President and Vice President of the Hartford Federation of Teachers ("HFT" or the "Union") for several hours, at about that time.  They reviewed the decision as to each teacher on the list of transferees.  Dr. Colon discussed each individual teacher on the list, agreeing not to transfer some, and providing reasons why he felt others must be transferred.  But as to plaintiff, by contrast, Dr. Colon expressly told the HFT Officers that <u>June Bernabucci had made that decision, not he, and if they wanted that decision reversed, they must speak with her</u>.  GIMF 1c. [2]

Before Colon was offered the position as Principal of HPHS, Superintendent Amato told former principal Joseph Wall of his intent to transfer a "core" of teachers out of HPHS, but he did not specify the reason. GIMF 1a.  Wall suggested he transfer out the teachers of the Freshman Academy for intensive training, but Amato said that would take too much time.  He told Wall for the first time, in this conversation, that Wall would be transferred out of HPHS.  Colon described a conversation in which Mr. Wall told him he would be leaving HPHS;  and Colon said this was <u>before</u> Mr. Amato spoke with him about becoming principal.  *Id*.  So Amato informed Wall of the plan to transfer

---

[2]

HFT Pres. Vargas recalls only that Colon said the decision was made at the central offices, but V.P. Hagan recalls he identified Bernabucci as the decision maker.

teachers out of HPHS <u>before Colon was involved</u>;  the idea to transfer teachers did not, as the defendants assert, originate with Colon.  It was Amato's decision, but he refuses to explain a reason.

On August 14, when he met with plaintiff and Ms. Turcotte, Colon claimed he had not been able to have their transfers rescinded because there were "powers greater than" he, and <u>Bernabucci</u> told him he could not reverse their transfers.  At that point, he had never met Hodge, yet he asked Ms. LaPenna about him, and asked her whether, "if he could work something out" to bring her back to HPHS, she would agree to relinquish the FM position.  Yet Hodge's transfer letter was dated August 10, before Colon ever met him. GIMF 1f, l; 8a. Both Colon and Bernabucci agree it was she who recommended Hodge as FM.  GIMF 2d; 7d, e. Colon asserted that he needed to make sure he had a team that would be willing to work with him. GIMF 1l, m.  He admitted he knew nothing about LaPenna's history of outstanding performance.  And Hodge was being transferred out of his former school because of disagreements with its administration.  *Id*.

Colon testified <u>he had already communicated his desire to have plaintiff transferred back to HPHS, when Bernabucci made her recommendation that he appoint Hodge as FM</u>.  GIMF 2d, 7e. Before school started, he had obtained Amato's permission and had completed paperwork to transfer her back. *Id*.  According to HPS Director of Human Resources Stacy, the transfers were not effective until the first day of school. So it is indisputable that when Colon indicated his desire to retain LaPenna, Hodge was not yet transferred to  HPHS and LaPenna was not transferred out.  So the transfer could not have been a justification for removing Ms. LaPenna from her FM position.

LaPenna could have performed the FM job at HPHS even while she was assigned to teach at Webster. GIMF 6a-e. On the first day of school, Colon told LaPenna that as far as he was concerned, she was still the FM at HPHS;  he had no problem with her continuing in that job. GIMF 7a. At the CHRO, HPS took the position that Colon's view of the matter was irrelevant: one simply could not be FM while teaching at a different school. *Id*.  Bernabucci, who had previously espoused the theme that it would have been impossible, testified that Colon's opinion could not be irrelevant: if Colon wanted LaPenna to do it, she could have. GIMF 7b. Now defendants assert Colon decided she could not have the job because he had already placed Hodge in it. But at the CHRO, it was not his decision to make.

At the CHRO, Dumont claimed Webster Principal Burr was the decision maker:  he refused to allow plaintiff to leave early to go to HPHS. GIMF 7c.  First, it would not have been necessary for LaPenna to leave Webster School early to perform the job;  and second, Burr testified nobody asked him about LaPenna leaving early. *Id*.  Bernabucci testified that Dumont was the decision maker, but Dumont testified he neither made the decision nor had any opinion on the matter. GIMF 7b.

HPS transferred LaPenna back to HPHS in late September, but refused to place her back in her position as FM.  Dumont told Ms. LaPenna she could return to HPHS as a Physical Education teacher, because Hodge had agreed to do her a favor and teach math instead of Physical Education. But he also told her she would not be FM, and she "had better not make any trouble." GIMF 8c.

At the CHRO investigative conference, Colon told a different story than at the time of the transfers.  He claimed former Principal Joseph Wall gave him a list of teachers to transfer, and

plaintiff's name was on it.  In interrogatory responses, Colon changed his answers, but near the time of his deposition he changed them yet again. He had sworn he took other administrators' advice to transfer plaintiff;  then he swore he only recalled hearing Wall say LaPenna was "not a team player;" and then it was either Wall or Holloway who said she was "not a team player."

Now HPS claims the reason Janice LaPenna lost her job as FM was the transfer to Webster School.  A rational fact finder could find this explanation unworthy of credence, given the totality of the circumstances, including that she did not lose this job until after the decision had been made to rescind the transfer.

**The SSA Matter**

In 1998, June Bernabucci wanted the other high schools in Hartford to change long-standing extracurricular athletic schedules to include teams from the Sports Sciences Academy ("SSA"), a charter school.  She was a founder of SSA and she served on its Board of Directors.  GIMF 13a-c.

The coaches objected, and as FM of Hartford High, plaintiff chaired the Athletic Council at which their concerns were raised.  Each athletic team could play only a finite number of games each year.  SSA was not a member of any "conference," or league.  As a result, games played against SSA could not provide "power points" towards Connecticut State Playoffs, as games against other schools' teams could.   This could lose them a spot in the State Playoffs.  GIMF 7d.  Plaintiff agreed with this argument, and also felt the traditional rivalries she had known since she was a little girl growing up in Hartford and attending HPHS were important to team and school spirit, and valuable to the entire

school community.  Plaintiff believes the school spirit and bonding from these athletic traditions keep students in school – something Hartford's students need.  *Id*.

In 1998, plaintiff was the spokesperson for the coaches, as FM.  Her efforts led to an emotional meeting with then-Superintendent Benjamin Dixon.  After that meeting, Superintendent Dixon did not require the schools to change their schedules to include SSA.  GIMF 7e.

In 1999, Bernabucci went to new Superintendent Amato and convinced him to require the coaches to schedule games with SSA.  She wrote the September 15, 1999 directive for his signature, ordering them to change their schedules accordingly (the "Directive"). GIMF 13f-g. The coaches were concerned, again, and discussed it in the Athletic Council.  LaPenna prepared a petition for the coaches to sign, dated October 8, 1999, asking Superintendent Amato to meet with them to discuss issues raised by this requirement (the "Petition").  LaPenna's name and telephone number were in the Petition, as the person with whom his office could arrange the requested meeting. GIMF 7h-i.

Amato did not hold a meeting with the coaches.  At his deposition, he said he concluded the coaches did not agree with his decision. GIMF 7j. According to Bernabucci, he told her to take care of the matter. *Id*. Bernabucci held an inquisition:  she summoned each of the coaches <u>and plaintiff</u> to her office and questioned them, tape recording and making notes of their answers (which notes and recordings she alleges she turned over to Mr. Amato and the defendants claim can no longer be located). GIMF 7k. Bernabucci sent a warning to the coaches and FMs that using school facilities to communicate any opinion other than the official position of HPS would be insubordination. GIMF

7n.  After the inquisition, Bernabucci announced that there would be no change in the Amato

Directive.  <u>From that time forward, Bernabucci was hostile toward plaintiff</u>.  GIMF 7n, p.

 In December 1999, Bernabucci issued a written warning to plaintiff's husband Louis

LaPenna, a Physical Education teacher.  Apparently, someone had faxed the Directive to Mil Mason,

President of the Central Connecticut Conference ("CCC").  According to Bernabucci the fax came

from Weaver High, where Mr. LaPenna teaches and coaches, and she assumed it was he who sent it

and his purpose was to somehow interfere with the Amato Directive. He had not sent it to the CCC,

but even if he had, it would not have violated any rule or law.  Bernabucci threatened him with

potential discharge. GIMF 7l-m.  It was apparent to Mr. LaPenna and Union Representative Bill

Hagan that she had become irrational about the SSA issue. *Id.*.  She threatened all the coaches, FMs

and Physical Education teachers, that opposing Amato's Directive or using school facilities to

communicate anything other than the "official HPS position" would be insubordinate.

 Opposition to Bernabucci's plan continued despite these strong-arm tactics. In spring, 2000,

HPS Chief of Staff Robert Henry held a hearing on the issue. Bernabucci was present, and annoyed.

David Hodge, football coach at SSA, championed her position in favor of requiring the other schools

to schedule games with SSA.  Weaver football coach Tim Sullivan presented the reasons the coaches

were opposed to the requirement. Mr. Henry decided the issue <u>against Ms. Bernabucci's position</u>, and

the other high schools have not been required to schedule games with SSA since.  GIMF 13o.

 Within a few months after Mr. Henry reversed the Directive, Bernabucci recommended that

David Hodge replace Janice LaPenna as FM and Physical Education teacher at HPHS. GIMF 13p.

A major contention of defendants' argument is that plaintiff was assigned to another school for "less than a month," implying this case is trivial;  and that she had no particular right to be assigned to one school or another. They claim she cannot demonstrate any adverse action from this transfer.  The transfer violated clear contractual rights;  and as a result of the transfer, according to defendants, plaintiff was removed permanently from her extracurricular <u>employment</u>.

Plaintiff asserts that her removal as FM, aside from being a breach of  contractual rights, was a deliberate act of retaliation, not a mere inadvertent side effect of her transfer.  It was the reason for the transfer, which was otherwise incomprehensible and has not yet been explained by defendants. The proffered reason for the transfer can be proven to be entirely unworthy of credence, arbitrary and capricious.  If Colon wanted a great team of outstanding teachers, he could not improve on plaintiff. The entire NEASC argument is a red herring.  No defense representative can logically explain any connection between improving HPHS or getting accreditation and transferrring plaintiff.  GIMF 2e.

There is abundant reason for a jury to conclude that plaintiff was transferred for the specific purpose of damaging her career, punishing her husband and her for their protected speech, and using her as an example to chill further dissent from coaches and FMs. Certainly, removing a female school teacher from her $10,000.00 per year extracurricular athletic assignment, mid-contract, in which she had provided outstanding performance, and replacing her with a much younger man in her place, is not trivial.  The effect of Hodge becoming the incumbent, and the effects of the unlawful actions

perpetrated against her, led to her inability to regain the position after that time.  GIMF 14.

Additional pertinent facts are set forth in the argument section, as appropriate.

## LEGAL ARGUMENT

## I.     STANDARDS FOR SUMMARY JUDGMENT

It is black letter law that in considering a motion for summary judgment, a court "must draw

all reasonable inferences in favor of the nonmoving party, and it may not make credibility

determinations or weigh the evidence."  Reeves v. Sanderson Plumbing Products, 120 S.Ct. 2097,

2110 (2000) (citing Lytle v. Household Mfg., Inc. 494 U.S. 545, 554-555 (1990); Anderson v.

Liberty Lobby, 477 U.S. 242, 254 (1986);  Cont. Ore Co. v. Union Carbide & Carbon, 370 U.S. 690,

696, n. 6 (1962).  "Credibility determinations, the weighing of evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge."  Id., quoting Liberty

Lobby, 477 U.S. at 255.  The Court "must disregard all evidence favorable to the moving party that

the jury is not required to believe."  Id. at 2110.  The "court should give credence to the evidence

favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted

and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"  Id.,

quoting Liberty Lobby at 300.  In the case at bar, the defendants have little unimpeached evidence.

As our Court of Appeals noted in Hollander v. American Cyanamid Co.,

[b]ecause employers rarely leave a paper trail - or "smoking gun" - attesting to discriminatory
intent [ ... ], disparate treatment plaintiffs often must build their cases from pieces of
circumstantial evidence which cumulatively undercut the credibility of the various
explanations offered by the employer.

895 F.2d 80, 85 (2d Cir. 1990) (citations omitted).  The fact that an employer's stated reasons for its action have shifted over time, or that the testimony includes discrepancies, is sufficient to permit an inference of discrimination.  EEOC v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994).

In Kinsella v. Rumsfeld, 320 F.3d 309 (2nd Cir. 2003), the Court overturned the grant of summary judgment in a McDonnell-Douglas burden-shifting case, noting:  Summary judgment is appropriate ... only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact.  320 F.3d 314 (citing and quoting Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134-35 (2d Cir.), *cert. denied*, 530 U.S. 1261 (2000) (emphasis added)).

The Carlton Court pointed out that an employer's proffer of a reorganization as the reason for an adverse action is insufficient, in itself, to provide a defense, once the plaintiff establishes a *prima facie* case.  If the particular choice of the plaintiff is not warranted by the decision to reorganize, then the employer has not truly articulated a legitimate nondiscriminatory reason for the adverse action at issue. 202 F.3d 136-37.  *See, also,* EEOC v. Ethan Allen, Inc., 44 F.3d 116, 120 (2nd Cir. 1994); Montana v. First Federal Savings & Loan, 869 F.2d 100, 104-06 (1989).  This case is similar to the reorganization/reduction in force cases:  even if HPS had some valid reason to transfer a "core" of teachers out of HPHS, it had no credible reason to transfer plaintiff out. Neither the "team player" claim nor any aspect of the NEASC accreditation problems justified that.

With a strained reading of case law, defendants assert that plaintiff's abundant proof that they proffered false reasons does not "necessarily" create a genuine issue of material fact.  Defense Mem.

p.13. This is incorrect. Their proffer of false reasons does precisely that; that is the only reason it does not immediately entitle the plaintiff to judgment. In St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993), the Court noted that disbelief of an employer's proffered reason does not compel a finding of discrimination, but it permits one. The decision wryly comments, "particularly if disbelief is accompanied by a suspicion of mendacity," it suffices to prove intentional discrimination. 509 U.S. 511. It is worth considering why McDonnell-Douglas inference doctrine has arisen in these cases. It is

> merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. A *prima facie* case under McDonnell Douglas raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. *See,* Teamsters v. United States, 431 U.S. 324, at 358 n.44 (1977). And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as race.

Furnco Constr. Corp. v. Waters et al., 438 U.S. 567, 577 (1978). These presumptions are created to reflect judicial evaluations of probabilities, and to conform with the employer's superior access to the proof. Where the defendants' proffered reasons do not make sense, the fact finder has sufficient evidence, in most but not all cases, to conclude they are concealing discriminatory action.

Given this standard, it is amazing that the defendants could expect to be entitled to judgment. This case is replete with reason to suspect mendacity in the employer's proffered reasons. Colon's

shifting statements alone create reason to suspect mendacity.  Amato's claim that he merely

supported Dr. Colon's desire to transfer teachers to ensure accreditation for HPHS, could be found

mendacious, in light of his statement to Wall, <u>before</u> Colon was ever offered the principalship, that he

intended to transfer a "core" of teachers out of HPHS.  The claim by Bernabucci that she did not

suggest the transfer of plaintiff, but actually objected to it, may reasonably be found to be

mendacious, because Colon expressly identified her as the decision maker to the HFT officers

contemporaneously, and told them only she could reverse the decision;  and in the August 14 meeting

with plaintiff and Ms. Turcotte, he also said the decision was made "downtown" and not by him, and

Bernabucci would not let him reverse it.  Bernabucci's angry conduct towards plaintiff and her

husband after the Petition further support an inference that she made or caused the decision,

motivated by retaliatory animus.  The claim that Colon selected Hodge because he needed "team

players," and had heard Wall or Holloway comment that LaPenna was not a team player, may be

found to be mendacious, not only because both Wall and Holloway have attested they neither said nor

heard such a thing and would have corrected it if they had, but in light of the facts that Hodge's

transfer letter is dated before Colon met him;  that Colon had already communicated his intent to

have LaPenna transferred back to HPHS before Bernabucci recommended Hodge be transferred in

and made FM;  and that Hodge was leaving SSA due to difficulties with its administration.

     The disinterested witnesses here are Holloway and Wall, who are retired from HPS, Gunn,

whose job was never threatened, and Vargas and Hagan, who are no longer HFT officers.  Defendants

have proffered no evidence from a disinterested witness.  They proffer the urgency of the need to

obtain NEASC accreditation, which, they claim, required that Colon be given absolute *carte blanche*

to do anything he chose, even if arbitrary or capricious, discriminatory, unconstitutional or violative

of contract rights.  When *carte blanche* is acceptable, we will have abandoned any rights in public

employees, contrary to all precedent.  But here the NEASC argument is simply a red herring.

## II.    PLAINTIFF HAS SUFFICIENT EVIDENCE TO SUSTAIN HER FOURTEENTH AMENDMENT CLAIMS.

Defendants assert plaintiff cannot sustain a Section 1983 claim because she cannot establish a

genuine issue of material fact that she was deprived of a constitutional right.  Defense Mem. p.17.

They also assert she cannot show any evidence that Bernabucci was involved in the decisions;  *id.* p.

25-6;  and they raise qualified immunity.  Each of plaintiff's claims can be sustained as pleaded.

Plaintiff asserts Section 1983 claims against Mr. Amato in the First Count of the Second

Amended Complaint, Ms. Bernabucci in the Second Count, and Dr. Colon in the Third Count.[3]  In

each count, plaintiff has asserted three constitutional violations:  1) speech rights, 2) equal protection

rights, and 3) due process rights.  In the Fourth Count, plaintiff asserts that the City, HPS and SBT

gave the individual defendants authority to take these actions, should have known about their

unlawful conduct, and took no appropriate action to train administrators against sex discrimination

and first amendment retaliation.  They thereby showed indifference to the violations of plaintiff's

---

[3]

 In the consolidated case against Dr. Colon, plaintiff also asserts the same three claims.

rights.  The evidence is sufficient to sustain each of these claims.

### A.     PLAINTIFF CAN SUSTAIN HER  FIRST AMENDMENT CLAIMS.

Defendants argue that plaintiff cannot show she spoke out on any matter of public concern,

therefore they could not possibly have taken action against her because of speech.

### 1.  The SSA Issue Was a Matter of Public Concern, and Defendants Were Aware of Plaintiff's Speech in Opposition to Their Plan.

"As a general rule, speech on 'any matter of political, <u>social, or other concern to the</u>

<u>community</u>' is protected by the First Amendment."  <u>Mandell v. County of Suffolk</u>, 316 F.3d 368, 383

(2nd Cir. 2003) (Citing and quoting <u>Connick v. Myers</u>, 461 U.S. 138 at 146 (1983) (emphasis added).

The coaches who objected to <u>requiring</u> that they include SSA in the City Series games had several

reasons that had to do with the quality of the athletic programs in their schools, including the impact

on their students' teams' standing in State playoffs, the necessity to eliminate games with traditional

rivals or games with greater community interest, and the potential impact on school and community

spirit.  Plaintiff had concerns about school spirit and bonding, and its impact on retention of high

school students. This is not a case in which the employer can demonstrate that plaintiff's speech, a

Petition to the Superintendent asking him to meet with the coaches, interfered with school operations

or discipline, or impeded anyone's job performance.  *See*, <u>Jeffries v. Harleston</u>, 52 F.3d 9, 13 (2nd

Cir.), cert. denied, 516 U.S. 862 (1995).  Nor is this a case in which plaintiff sought to bring a private

personnel matter to public attention.  She spoke out about a matter of concern to the school

community, as demonstrated by the involvement of Principal Paul Stringer, former Superintendent

Dr. Benjamin Dixon, Robert Henry and his hearing, and dozens of coaches, teachers and FMs in opposing Bernabucci's plan.

### 2. There Is Direct Evidence of First Amendment Retaliation.

Colon expressly told plaintiff, when she asked why she had been transferred out of HPHS, that she had "made an enemy of someone," and her "mouth had gotten her in trouble." He told the HFT officers that the decision to transfer plaintiff was made downtown and by Bernabucci, and only she could reverse it, by contrast to the other transferred teachers. He told plaintiff and Turcotte he had not yet been able to get them transferred back to HPHS, although he wanted them back, because there were "forces more powerful than" he, and Bernabucci said he could not transfer them back. Even at his deposition, after abandoning his claims about other administrators' recommendations, he testified that he merely took Bernabucci's recommendations when he made any decision at issue. At a minimum, Colon's statements create a genuine issue of material fact whether plaintiff was punitively transferred in retaliation for speaking up about something the administration wanted to prevent teachers from addressing, and also whether Bernabucci was the decision maker.

Defendants cannot have it both ways. If they want to rely upon any testimony of Colon's, such as his current assertion that he was the decision maker, they are stuck with all his testimony. If Colon was telling the truth at his deposition, then by that testimony he was telling the truth in the summer of 2000, contemporaneous with the actions at issue, when he told the HFT officers and plaintiff and her colleagues, that Bernabucci, or someone "downtown," decided to transfer plaintiff

because her mouth had gotten her in trouble, and he had nothing to do with the decision.  If he was truthful at the CHRO investigation, then former principal Wall recommended plaintiff's transfer;  but now he admits the story about a recommendation from Wall was false, so he could not have been truthful at the CHRO.  If he was truthful in the Interrogatory responses in this case, he accepted advice from former administrators to transfer plaintiff.  But at his deposition, he denied that anyone had made such a recommendation.  He has retreated to the claim, in another part of his deposition, that either Wall or Holloway stated plaintiff was "not a team player," at a meeting at which both were present; and he had to make sure he had only "team players," as subjective a criterion as any employer ever proffered.  But Wall and Holloway, both of whom are now retired and disinterested witnesses, have each attested they neither said nor heard any such statement, and if they had they would have corrected it as untrue.  At any rate, Colon's credibility is certainly at issue, and as the Supreme Court said in <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133 at 151 (2000), the Court should accept only "uncontradicted" and "unimpeached" testimony from "disinterested witnesses."  Colon's does not fall into that category, and  neither does Amato's or Bernabucci's, in light of his.

        We are left, however, with direct evidence that Bernabucci made the decision to transfer plaintiff out of HPHS, and out of the position as FM, and that the reason for the action was that plaintiff's mouth had gotten her in trouble and earned her an enemy "downtown."  There is nothing this could refer to but the SSA matter, about which Bernabucci was irrationally angry.

### 3.  There Is Substantial Additional Evidence of a First Amendment Violation.

Aside from the direct evidence from Colon's contemporaneous statements, there is abundant evidence from which a rational fact finder could infer that Amato and Bernabucci took action to retaliate against plaintiff because she had been a "ringleader" in raising issues they sought to avoid, and to chill any further opposition to their decisions.  Defendants' strained reading of plaintiff's 2003 deposition testimony, that she could not recall her specific words at the 1998 meeting with former Superintendent Dixon, or in her conversations with Bernabucci that year, does not eliminate this evidence.  Plaintiff need show only evidence of facts from which retaliatory intent can reasonably be inferred.  Gagliardi v. Village of Pawling, 18 F.3d 188, 190 (2nd Cir. 1994).  This case is replete with such evidence.  The record shows plaintiff was the spokesperson for the coaches both in 1998 and in the October 8, 1999 Petition, and that she was attempting to address a matter of public concern.

Plaintiff's efforts in 1998 led to an emotional meeting with Superintendent Dixon, who did not order the coaches to include SSA.  In 1999, plaintiff's name was in the body of the Petition seeking a meeting with Superintendent Amato.  Defendants' argument that she did not sign the Petition is obviously specious, in light of the fact that Bernabucci included her in the resulting inquisition, questioning her and providing the notes from the interview to Amato.  A rational fact finder could conclude that Amato and Bernabucci perceived LaPenna's active participation in preparing the Petition.  It is plain that to Bernabucci, Janice LaPenna and also Louis LaPenna represented the opposition to her SSA plan.  She had irrationally threatened Louis LaPenna's job, on

the incorrect assumption that he had sent the directive to Mil Mason.  She had been hostile to Janice

LaPenna ever since the time of the October, 1999 Petition.  She knew they were married to one

another and had a daughter.  In the spring of 2000, after a hearing, Bernabucci's plan was reversed by

Robert Henry's decision.  A few months later, plaintiff was transferred, on Bernabucci's suggestion.

It is not a strained inference, that when Colon told LaPenna she was transferred because her

mouth had gotten her in trouble and she had made an enemy downtown, the truth was that Bernabucci

and Amato punished her and her husband for their speech in opposition to the SSA Directive, a

matter of public concern.  As FM, Ms. LaPenna would still head the Athletic Council at HPHS, and

would still have a platform.  As neither FM nor a coach, and while working at an elementary school,

she would have no input into high school athletics at all.  Bernabucci had expressed her intent to warn

the coaches and FMs not to interfere with her or Amato's decisions, when she sent her December,

1999 memorandum.  This was a stronger warning, intended to chill any future objections to

administrative action.  Plaintiff's removal as FM and her replacement with Hodge, plus the

involuntary transfer, was a strong message to them all, of what the administration would do to

objectors.

### B.    THE EVIDENCE SUPPORTS A FINDING OF AN EQUAL PROTECTION CLAUSE VIOLATION BASED UPON GENDER DISCRIMINATION.

Defendants argue that plaintiff's equal protection gender claim fails because she cannot make

out a *prima facie* case or produce evidence beyond a *prima facie* case;  and because only Colon was

involved in the decision, and he rectified his mistake right away.  Defense Mem. pp. 17-19.

As defendants point out, <u>McDonnell-Douglas</u> burden-shifting analysis applies to this Section 1983 claim. <u>Annis v. County of Westchester</u>, 136 F.3d 239 (2nd Cir. 1998). Plaintiff must establish a *prima facie* case by showing she is female, she was qualified for her job, she suffered an adverse action, and there are circumstances which give rise to an inference that her gender motivated the action, at least in part. The inference evidence required for a *prima facie* case is *de minimus*. Such circumstances are present where the plaintiff has been replaced by a person outside the protected class. *See*, <u>Cooke v. Prototype & Plastic Mold Co., Inc. et al.</u>, 220 F.Supp. 2nd 104, 109 (D.Conn. 2002) (citing <u>Roge v. NYP Holdings, Inc.</u>, 257 F.3d 164, 168 (2nd Cir. 2001). The establishment of a *prima facie* case through replacement by an employee outside the protected class, plus evidence that the employer's proffered reason is not the true reason for the action, suffices for a jury to find the ultimate fact of discrimination. <u>Zimmerman v. Associates First Capital Corp.</u>, 251 F.3d 376, 381 (2nd Cir. 2001). Contrary to the defendants' argument, after <u>Reeves</u>, our courts have made it clear repeatedly, that an employer's proffer of a false reason for its action will suffice to support a verdict for the plaintiff. *Id.*; <u>Cooke v. Prototype</u>. A defendant can prevail despite a pretextual proffered reason only in rare circumstances, such as where the record conclusively proves some other nondiscriminatory reason for the decision, or where there is abundant and uncontroverted independent evidence that no discrimination occurred. <u>Reeves</u>, 530 U.S. at 148. If a plaintiff establishes a *prima facie* case and evidence that permits a finding that a proffered explanation was false, it will rarely be appropriate to grant judgment to the defense. *Id.* at 154 (Ginsburg, J.,

concurring).

The Court can consider the strength of the *prima facie* case, the probative value of the proof that the defendant's reason is either unworthy of credence or, even if it may deserve some credence, is not the true reason, in that it does not explain the action at issue. It is proper to impute to the employer the discriminatory or retaliatory attitude of anyone who exercised influence or leverage over the decision maker. Cooke v. Prototype, 220 F.Supp. 2d 104 at 110.

Defendants concede, as they must, that plaintiff is qualified for her jobs both as teacher and FM. They irrationally argue she suffered no adverse action, and they assert she cannot prove she was replaced by a male in her teaching position, as if the case were confined to that claim.

### 1. Plaintiff Suffered an Adverse Action and Was Replaced by a Male.

First of all, HPS Director of Human Resources Robert Stacy testified that plaintiff's transfer to Webster School was an adverse action, and that is why only he could sign the letter notifying her of it. GIMF 3a. Second, plaintiff is a female, she was performing superlatively in her position as FM, a $10,000.00 per year position, and she was replaced in that job by a man, Hodge. It hardly seems worth the ink to argue that taking away a $10,000.00 extra duty position is an adverse action. Third, when plaintiff was transferred back to HPHS, Frank Dumont told her it was because Hodge agreed to "do her a favor" and teach math rather than Physical Education, to make a place for her. So he was in the position she had vacated, and for her to return he had to "do her a favor" and relinquish it.

From this, any _rational_ fact finder would decide plaintiff suffered an adverse action and was replaced by a male.  Plaintiff can sustain a _prima facie_ case of great strength.

When plaintiff was transferred out of HPHS, defendants assert that she could not be FM at HPHS any longer.  According to several witnesses, and as supported by HPS's own practices, Ms. LaPenna could have performed the job of HPHS FM, as she had for the past four years, while she was teaching at Webster School.  Harry Holloway, who supervised FMs for many years but is now retired, attests she could have; Betty Gunn and Louis LaPenna, who work with the FMs, agree. GIMF B6a-d. Plaintiff submits the transfer itself was a pretext to conceal discrimination or retaliaton.

Bernabucci and Robert Stacy insisted that one must be present at the school all day to be FM. Stacy said he drew that conclusion from the job description, but when he reviewed the job description he admitted it contained no such requirement.  GIMF B6e.  Bernabucci said the requirement was a "position" that had always been taken by HPS. Yet at the current time, the FM at Weaver High, _a man_, teaches there only for two periods at the beginning of the day;  then he goes to a middle school for the balance of the school day and returns to Weaver between 2:30 and 3:00, well after the end of the school day. GIMF 6b. The coaches do not find this a problem, because the FM's job duties need not be performed during or immediately after the school day by someone physically present in the building. GIMF 6b-e. It is the coaches who must be there right after school for practices.  Plaintiff could have done the job while teaching at Webster School, because she would have had time in the morning to be at HPHS, before she was required to begin her teaching day at Webster.  GIMF 6d.

Adverse employment actions include any diminution of duties, or any transfer to a position with less opportunity for advancement.  Rodriguez v. Board of Education, 620 F.2d 363, 366 (2nd Cir. 1980); De La Cruz v. New York City Human Resources Admin., 82 F.3d 16, 21 (2nd Cir. 1996); Leak v. United Techs. Corp., 81 F.Supp.2d 373, 376 (D.Conn. 1999).  Defendants' actions in transferring plaintiff, if it led to her removal from the FM position, caused plaintiff to suffer a diminution of her extracurricular duties and removed a job opportunity for her;  it was, therefore, an adverse action.

If we were to indulge the fiction that the loss of this job opportunity was merely an inadvertent side effect of the unjustifiable transfer in plaintiff's teaching assignment, because plaintiff could not perform the FM position adequately while teaching at Webster School, then the teaching assignment transfer was itself an adverse action.  Defendants argue in vain from the line of cases such as Galabya v. New York City Bd. Of Ed., 202 F.3d 636 (2nd Cir. 2000), where teachers complained of transfers to different grade levels or subject matter within their certification.  As the Galabya Court said, an adverse action is one which results in

> a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation. ... A transfer is an adverse employment action if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career."

202 F.3d 640-41.  The key is to show a "materially significant disadvantage."  *Id.*  The transfer at issue in this case resulted in plaintiff's loss of the more distinguished title of FM for all athletics at HPHS, significantly diminished material responsibilities, and a $10,000.00 per year pay loss. Plaintiff had every reason to expect she would continue in that position through the rest of her career,

unless she chose to take a different position.  She suffered a materially significant disadvantage.

There is reason to infer that the entire purpose of the transfer was to punish her, and no other intelligent reason has been proffered;  so plaintiff does not accept that this was a mere inadvertent side effect of a legitimate interest in transferring her.  On August 1 and again on August 14, both times before Colon ever met Hodge, Colon and plaintiff met.  He told her he would take steps to have her transferred back to HPHS.  On August 10, HPS sent a transfer letter to Hodge, assigning him to HPHS.  Hodge's transfer predated Colon's August 14 meeting with plaintiff and Turcotte, where he admitted he had never met Hodge.  According to Stacy, there is reason to believe no transfer was effective until school started on August 28, by which time Colon, if he were the decision maker, could have avoided the entire problem.  Instead, HPS left the transfer in effect, and removed plaintiff from her FM position, with no justification -- certainly none from Colon's decision making.

Whether plaintiff's loss of her extracurricular job was the defendants' intent and purpose, or a mere inadvertent side effect of the transfer, defendants were aware, before the transfer was made, that plaintiff would lose the FM position.  They placed David Hodge in the position in direct violation of plaintiff's rights, even after Colon had already communicated that he wanted plaintiff to remain at HPHS.  They refused to return her to it, even after she was transferred back to HPHS.  So the transfer remained an adverse action, even after it was undone.  It had either led to, or given a pretextual justification for, her permanent removal from a paying job.

### 2.  The Discrimination and Its Results Did Not Disappear When the Transfer Was Rescinded after Four Weeks.

Defendants argue that plaintiff suffered no adverse action because she was transferred back to HPHS four weeks after the school year started, and ultimately they paid her the wages she would have earned in that one school year as FM.  Defense Mem. pp. 7-8. They coyly argue, "plaintiff has never claimed that she lost pay or benefits as a teacher."  It is true that her basic teacher's salary was not reduced, nor benefits <u>other than the opportunity for her extracurricular job</u>.  But defendants yanked her out of her FM position, and refused to give it back even after she was transferred back to HPHS.

Nor was the onus of the transfer eliminated.  Every day of the 2000-2001 school year, after she was transferred back to HPHS, plaintiff was left with no professional involvement in the school-wide athletic programs for which she had worked hard enough to earn "outstanding" ratings for years. She had been threatened by Frank Dumont that she "had better not make any trouble," and since all of her actions had been in support of what she believed were the interests of her students, she was in a very difficult position even to assist with NEASC efforts, which entailed recommending change. Each day she faced a school where everyone knew she had been removed as FM and replaced by a young man.

Plaintiff was angry, depressed and bitter that year, and the loss of financial support for her family was not rectified.  Despite defendants' boasting, at the current time, that she has been paid the wages of the FM position for the 2000-2001 school year, during that entire school year and most of the next, her claims that she had been wrongfully removed from her position were ignored by HPS

and the wages were not paid. LaPenna Affid ¶¶40, 44.  They claimed that since she had not

performed the job, she was not entitled to be paid.  It was not until after she obtained an EEOC Right-

to-Sue Letter and dismissal from the CHRO to file this action, and on the eve of the arbitration of her

grievance, that HPS paid the obviously long overdue contract sum for the 2000-2001 school year.

Before that time, while HPS was still persisting in its oppressive action and cheating her out

of contractually due wages, in June, 2001, the FM position was posted, and plaintiff applied, as did

David Hodge.  When plaintiff arrived to interview for the position, she faced Bernabucci and Hodge,

and had a visceral reaction that strongly affected her ability to perform well in the interview.  She was

angry, bitter, dejected, and believed that no matter what she did or said in that interview, she would

never be given the job. GIMF 14. The results of the unjust actions of the previous summer continued

through and beyond the time of that interview.  But for the defendants' illegal action in placing

Hodge in her position the previous summer, she would probably have been the sole applicant in the

spring of 2001;  but even if there had been a field of applicants, plaintiff would have been in the

stronger incumbent position, and the bitter results of discrimination would not have affected her

performance.

### 3.  Amato and Bernabucci Are Liable for the Equal Protection Violations.

For the reasons set forth in Section II.A, *supra*, defendants are simply wrong in their assertion

that they can establish that neither Amato nor Bernabucci participated in the decisions or showed

deliberate indifference to plaintiff's equal protection rights.  There is evidence that implicates each of

them in the decisions at issue, both in transferring plaintiff to an elementary school and in taking

away her FM position.  Even if we were to indulge the fiction that it was entirely Colon's decision,

there is evidence that both of them evinced deliberate indifference when they became aware that

Colon was removing plaintiff from her HPHS teaching position, and replacing plaintiff with a

younger man in the position as FM, despite her excellent performance and her contractual right to

continue in each.

Defendants have also asserted that Amato and Bernabucci were not supervisors involved in

the decision to transfer plaintiff or remove her from her position.  They deny there was any deliberate

indifference which could attach liability to them.  Defense Mem. pp. 18-19.  In light of Bernabucci's

discipline of Louis LaPenna in 1999, and her memorandum to all of the FMs and coaches, the

argument that Bernabucci was not a supervisor is nonsense.  She was in a position to administer

discipline to FMs and coaches, therefore she was a supervisor.  Colon testified that he took her

recommendation when he accepted Hodge as FM, even though he had already communicated his

intent to have LaPenna transferred back, so Bernabucci was obviously in a position to influence or

make job assignments.  Colon did not know Hodge, he did not know plaintiff, he knew nothing about

the FM job, and he does not know anything about Physical Education, generally. Bernabucci was able

to alter plaintiff's terms of employment.  And when plaintiff was transferred back to HPHS, Dumont

made a note that it was done to allow Bernabucci to "save face" with "her" staff. GIMF 1m.

Defendants have argued Bernabucci could not have caused a constitutional violation because

she actually objected to the transfers.  Defense Mem. p.25.  Bernabucci's testimony is contradicted by

Colon's (he said she made no such objection), as well as by evidence that she recommended Hodge

as FM even after Colon indicated he wanted to have plaintiff transferred back to HPHS. GIMF B2j.

### C.  THE EVIDENCE SUPPORTS A FINDING OF DUE PROCESS VIOLATIONS.

Defendants correctly point out that plaintiff must show she was deprived of some property

interest, as an element of a procedural or substantive Due Process Clause claim.  Defense Mem. pp.

19-21.  But defendants inaccurately portray plaintiff's claim as an entitlement to a particular teaching

position, rather than the right to equal employment opportunities, and the right to be free from

deprivation of property by arbitrary and capricious action or in retaliation for exercising speech

rights.

### 1.  Plaintiff Has Asserted Legitimate Property Interests.

The property interests protected under the fourteenth amendment take many forms.  Board of

Regents v. Roth, 408 U.S. 564, 577 (1972).  The term "'property' denotes a broad range of interests

that are secured by 'existing rules or understandings.'" Perry v. Sindermann, 408 U.S. 593, 601

(1972) (quoting Roth, 408 U.S. at 577).  "A person's interest in a benefit is a 'property' interest for

due process purposes if there are such rules or mutually explicit understandings that support his claim

of entitlement to the benefit and that he may invoke at a hearing." Id.  A need or desire, or a unilateral

expectation, will not suffice to establish a property interest.  Roth, 408 U.S. 577.  But where a benefit

is secured by state law, or by contractual terms enforceable under state law, that establishes a

property interest in a public employee. <u>Ezekwo v. New York City Health & Hosp. Corp.</u>, 940 F.2d 775, 783 (2d Cir.1991).  The very case cited by defendants, <u>Ciambriello v. County of Nassau, Civil Service Employees Assoc., Inc. et al.</u>, 292 F.3d 307 (2nd Cir. 2002);  Defense Mem. p. 19;  holds that the terms of a collective bargaining agreement, if enforceable under local law, create property rights for purposes of Due Process Clause analysis.  292 F.3d 313-315.  A municipal employee has a property interest in her job if she cannot be discharged except for cause.  <u>Cleveland Board of Education v. Loudermill</u>, 470 US 532 (1985).

Plaintiff had contractual rights as a teacher for HPS under the Union Contract.  According to Robert Stacy, she had a two-year contract for the position as FM through June, 2001, from which position she could be removed only for good cause.  GIMF 5a-b.  In addition, she had contractual rights not to be transferred involuntarily unless two conditions were met:  she had to be given a conference with the Superintendent or his designee before she was transferred;  and any teacher with less seniority was to be transferred out of her department before she could be.  Stacy indicated that the Superintendent's "designee" was not Dr. Colon, but the Human Resources Department.  GIMF 4a-c.  So plaintiff has asserted property interests which are implicated in this case.

### 2.  The Evidence Shows Violations of Plaintiff's Contract Rights.

Plaintiff had more seniority than at least one Physical Education teacher who was retained at HPHS, and than either of the two new Physical Education teachers who were transferred into HPHS.  GIMF 4b.  So she had a property right in her assignment to HPHS, and the transfer that has been used

to justify her removal as FM violated her Due Process rights. She also had a right to a meeting with the Superintendent or his designee before the transfer could take place, and she was given no such meeting. GIMF 4c. Her substantive and procedural Due Process rights were thereby violated. In addition, plaintiff had a contractual right to another year in the position of FM, and therefore a property interest in that position was violated.

Colon admitted he knew nothing about plaintiff, yet defendants insist he decided to remove her from her FM job and transfer her. His sole justification (in its latest version), that either Wall or Holloway said plaintiff was "not a team player," has been proven false, and Colon himself said that otherwise, there was no justification. Amato gave him *carte blanche* authority akin to a queen who could order "off with her head," and nobody would review the decision for lawfulness or rationality. The due process clause provides protection from arbitrary and capricious action, where there is no clear and direct relationship between the articulated grounds for the action and the employee's ability to perform her job. *See*, Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992).

### 3. The Record Shows Violation of Procedural Due Process.

The lack of a meeting prior to the transfer violated substantive rights; but in addition, no hearing was held at which plaintiff could demonstrate she should not be transferred or that even if transferred, she should not be removed from her FM position. After he met the plaintiff, Colon concluded it was a mistake to transfer her. A rational fact finder could conclude that if plaintiff had been given the required meeting, no transfer would have taken place – absent an unlawful purpose.

**4.  The Record Shows Amato's Deliberate Indifference.**

Defendants argue that plaintiff cannot show reckless or deliberate indifference on Amato's part, therefore she cannot impose liability upon him for what they assert was solely Colon's action. Amato's testimony was a clear expression of deliberate or reckless indifference, when he stated, "we could not conclude one way or the other" whether the transfers violated the Union Contract;  so they transferred the teachers. GIMF 9b. He was defiant when the HFT Officers pointed out the contract violation. GIMF 9a. Plaintiff does not have to show that Amato knew the transfer actually violated her rights, for this purpose. The question is whether he was indifferent to whether or not HPS was violating her rights, once he was aware the transfer might violate the contract.  His testimony evinces the very definition of deliberate indifference. He decided it made no difference to his decision.

Nor could there be a better declaration of deliberate indifference than for the superintendent of schools to declare an individual school principal would have *carte blanche* to make any decision he wished regarding employment of tenured faculty, and everyone else must do whatever it took to enforce his decisions.  *Carte blanche* is absolute power;  our constitution and equal employment laws do include restrictions, but Amato decided to jettison them, he informs us.

According to Dumont, Colon could not possibly have acted independently to transfer plaintiff or any other teacher out of his school.  At his deposition, Dumont said the principal of a school could not have made an independent decision to transfer teachers out of a school. He could request the transfers, but the order would have to come from the highest levels of upper management. GIMF 2f.

Plaintiff is not required to show that Amato or Bernabucci actually made the decisions at issue, or directly participated in making them, to show their supervisory liability; she need only show some sort of "personal involvement." Hayut v. State University of New York, et al., 2003 US App. LEXIS 25723 (2nd Cir.). at *50. The requisite personal involvement may be established by evidence that an official (1) failed to take corrective action after learning of a subordinate's unlawful conduct; (2) created a policy or custom that fostered the unlawful conduct; (3) was grossly negligent in supervising a subordinate who committed unlawful acts; or (4) showed deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates. *Id.* In the meeting with HFT officials to announce the transfers, when they pointed out that this action violated the CBA, Amato responded defiantly, telling them "you have to do what you have to do." He was unconcerned whether plaintiff's or any other teacher's rights were violated. At a minimum, he ought to have provided plaintiff with the meeting required under the contract, prior to any transfer. If he was not literally personally involved, then he created the policy that fostered unlawful conduct, was grossly negligent in supervising his subordinates Bernabucci and Colon, and was deliberately indifferent to the results. He created a policy of *carte blanche* for Colon, in which there was no scrutiny for equal employment issues, contract violations or any other wrongful conduct.

The HFT officers met with Bernabucci and were similarly greeted with deliberate indifference and inaction. Colon had told them Bernabucci made the decision herself, and Bernabucci has admitted knowing of plaintiff's contractual rights. Bernabucci recommended that Hodge, her

champion in the Robert Henry meeting over the SSA matter, take plaintiff's place as FM.  Plaintiff

could have fulfilled that job even while teaching at Webster School, but Bernabucci recommended

removing her even after Colon had already indicated his desire to have LaPenna transferred back to

HPHS, and Colon agreed to that.  Defendants are not entitled to judgment as a matter of law that

Bernabucci bears no liability.  There is reason to believe she was personally involved in replacing

plaintiff with Hodge.

### D.  DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

Defendants argue they are entitled to qualified immunity because they were performing

discretionary functions and their conduct did not violate clearly established statutory or constitutional

rights.  Defense Mem. pp. 27-30.  First of all, the Union Contract required that the Superintendent or

his designee meet with plaintiff prior to this involuntary transfer, and the defendants' failure to

provide any such meeting is an act of ministerial neglect which removes any qualified immunity.  Id.

p. *55.  Hayut, supra, 2003 US App. LEXIS 25723 (2nd Cir.). at *55.

As to discretionary acts, one of the individual defendants might be entitled to immunity upon

a showing either that s/he did not violate any clearly established right, or that it was objectively

reasonable for him/her to believe they were not violating such rights.  McCullough v. Wyandanch

Union Free School District, et al., 187 F.3d 272, 278 (2nd Cir. 1999).  The purpose of this protection,

as the Court of Appeals for the Second Circuit has explained, is to protect "government officials from

liability they might otherwise incur due to unforeseeable changes in the law governing their conduct."

<u>Sound Aircraft Services, Inc. v. Town of East Hampton</u>, 192 F.3d 329, 334 (2nd Cir. 1999).

Defendants can hardly assert they were unaware Ms. LaPenna had a right not to be removed from her

FM position absent just cause, or involuntarily transferred in violation of seniority rights: contract

law is not late-breaking.  Bernabucci testified she was aware of these rights;  and Amato said HPS

had considered the matter whether the transfer violated the Union Contract and could not conclude

one way or the other – although his advisor Stacy admitted the points at the time of his deposition.

The law is well settled that a school district is bound by the terms of its collective bargaining

agreements.

      Nor can defendants credibly assert that they were unaware a government employee has a right

to be free from totally arbitrary and capricious decisions by an official who is given *carte blanche*.  A

school administrator cannot sustain that claim in the current education law environment. Defendants

cannot credibly assert they were unaware that the First Amendment prohibits retaliation based upon a

teacher's speech on how students' extracurricular activities are administered, which has been clearly

established law for decades.  In light of the fact that Bernabucci summoned LaPenna to her

inquisition after the Petition, then turned her notes of the interview over to Amato, they cannot argue

they were unaware LaPenna had spoken out on a matter about which there was significant public

concern.  They cannot reasonably assert they were unaware of the prohibitions against sex or age

discrimination, or that replacing Ms. LaPenna with a male fifteen years younger than she, in a job she

had performed outstandingly, might violate those laws.  Qualified immunity does not shield any of

the defendants.

Connecticut recognizes several exceptions to the rule that municipal employees are immune to suit for their discretionary acts.  In <u>Burns v. Board of Education</u>, 228 Conn. 640, 645 (1994), the Court recognized exceptions to immunity "where a statute specifically provides for a cause of action against a municipality or municipal official for failure to enforce certain laws ... and where the alleged acts involve malice, wantonness or intent to injure, rather than negligence." (Citations omitted.) *Id.*  Conn.Gen.Stat. §31-51q specifically provides a cause of action for first amendment retaliation, and Conn.Gen.Stat. §46a-60 specifically provides a cause of action for gender discrimination;  both statutes create liability in any state or municipal entity and its agents.  Given the genuine issues whether Bernabucci and Amato intended injury to plaintiff, either out of anger towards her or to warn all such employees, the malice and/or intent to injure exceptions remove any immunity as to them.

## III.    PLAINTIFF CAN SUSTAIN HER DISCRIMINATION CLAIMS.

As to plaintiff's gender discrimination claims, she has adequately supported them at Section II.B. above.  As to her age discrimination claims, plaintiff has presented a genuine issue of material fact under the burden-shifting method, in that she has presented a *prima facie* case of discrimination and pretext.  Defendants admit she was within the protected age group, and she was replaced by someone outside the protected class. Defense Mem. p.6. To be more precise, at the time of the actions at issue plaintiff was forty-nine years of age, and David Hodge was 34.  GIMF 12a.  They dispute that

she suffered an adverse employment action;  Defense Mem. 8-9;  but that argument has been

rebutted, above.  She has an indisputable *prima facie* case of age discrimination. *See* Zimmerman v.

Associates First Capital Corp., 251 F.3d 376, 381 (2nd Cir. 2001) ("the mere fact that a plaintiff was

replaced by someone outside the protected class will suffice for the required inference of

discrimination at the prima facie stage ...");  Cooke v. Prototype & Plastic Mold Co., Inc., 220

F.Supp.2d 104 (D.Conn. 2002) ("because Prototype replaced Cooke with someone who was fourteen

years his junior the termination occurred under circumstances which could give rise to an inference of

discrimination.").  The quantum of evidence needed by an ADEA plaintiff is the same as that needed

to sustain the ultimate inference in any other civil case.  Schnabel v. Gary Abramson, et al., 232 F.3d

83, 90, n. 5 (2nd Cir. 2000).  This burden is met so long as any unprotected employee was retained and

the plaintiff was in a protected group.  *Id.*

　　　Perhaps the defendants have simply confused the minimal burden at the *prima facie* stage,

with the more substantial burden to prove pretext by a preponderance of the evidence.  At any rate,

the contention they are entitled to judgment for lack of a *prima facie* case is misplaced at best.

　　　Plaintiff is not required to prove that age was the sole factor for her discharge, but only that it

played a motivating role.  If the jury were to decide Colon's comment that he made these transfers

because he needed to bring in "new blood" is direct evidence of age discrimination, plaintiff would

not need to be concerned with pretext.  Nonetheless, plaintiff can readily show that each of the

reasons proffered by defendants is either unworthy of credence (such as the false statements about a

list or a recommendation from former principal Joseph Wall), or is not the true reason for transferring plaintiff (such as the urgent need to work towards NEASC accreditation).

As to the specific claim that HPS had just cause to remove plaintiff as FM because she would not be teaching at HPHS all day, plaintiff has presented sufficient evidence to create an issue of fact whether she needed to be teaching at HPHS in order to perform the job.

**IV     THE STATE BOARD IS NOT ENTITLED TO SOVEREIGN IMMUNITY.**

Defendants assert that the State Board of Trustees ("State Board") is entitled to Eleventh Amendment or sovereign immunity, as a state agency. Defense Mem. pp. 30-31, 37. Defendants did not plead either Eleventh Amendment or any other theory of sovereign immunity as an affirmative defense, and they are therefore barred from asserting it.

Not every agency created by a state is entitled to either sovereign immunity or Eleventh Amendment immunity. The State Board of Trustees for the Hartford Public Schools, which was created as a temporary substitute for a municipal board of education, is acting in a municipal capacity, performing traditionally municipal functions, and the State fisc is not threatened. The State Board is not entitled to Eleventh Amendment immunity, any more than is the New York Thruway Authority.

In Mancuso v. New York State Thruway Authority, 86 F.3d 289 (2nd Cir. 1996), the Court noted that Eleventh Amendment immunity does not apply to suits against counties, municipalities and other political subdivisions. A political subdivision is entitled to immunity "if it can demonstrate

that it is more like 'an arm of the State' than like 'a municipal corporation or other political subdivision.'" 86 F.3d 294 (citing and quoting <u>Mount Healthy City School District Board of Education v. Doyle</u>, 429 U.S. 274, 280 (1977).

<u>Thruway Authority</u> adopted the factors set forth in <u>Lake Country Estates v. Tahoe Regional Planning Agency</u>, 440 U.S. 391 (1979) to determine whether an entity is an "arm of the state:"

> (1) how the entity is referred to in the documents that created it; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's obligations are binding upon the state.

*Id.* The Court noted that where the factors do not all point in one direction, the guiding principle for Eleventh Amendment immunity must be protection of the state fisc. *Id.*, citing <u>Hess v. Port Authority Trans-Hudson Corporation</u>, 130 L. Ed. 2d 245, 115 S. Ct. 394 (1994). Even though some of the factors favored immunity, the lack of any realistic threat to the state fisc in <u>Thruway Authority</u> supported the conclusion it is not an "arm of the state" entitled to Eleventh Amendment immunity.

Regarding the State Board of Trustees for the Hartford Public Schools, the factors also do not point in one direction. Special Act 97-4 refers to the entity as the "<u>State</u> Board," and the members were appointed by officials of the State. But the entity is funded by the City of Hartford, its functions are those traditionally performed by a municipal board of education, and the state maintained only the veto power it would over any municipal board of education. Most significantly, the obligations and liabilities of the entity are expressly to be borne by the City of Hartford, and are not binding upon the

state.  The state fisc is not threatened, so Eleventh Amendment immunity does not apply.

## V.    THE CITY IS LIABLE AS THE EMPLOYER.

Defendants urge that the City of Hartford cannot be held liable in this case because plaintiff cannot establish a municipal policy or custom, as set forth in Monell v. Dept. of Social Services, 436 U.S. 658 (1978).  Defense Mem. pp. 31-32.  They further argue that the City lacked any control over the Hartford Public Schools, and therefore should not be held liable as the employer of the individual defendants, under the anti-discrimination statues.  *Id.* pp. 35-36.

The Monell doctrine does not provide the sole basis for municipal liability under Section 1983. Indeed, the concept that it does was expressly rejected in Collins v. City of Harker Heights, 503 U.S. 115, 123 (1992). A municipal employer can be held liable for the actions of its management employees or agents to whom final decision-making authority has been delegated.  *See,* Pembauer v. Cincinnati, 475 U.S. 469, 480-83 (1986); St. Louis v. Praprotnik, 485 US 112 (1988).  Where individual defendants with final decision-making authority direct or authorize unconstitutional acts, they can be held liable individually.  Here, the management agents were the HPS administrators;  and the State Board is a management agent for the City which performs its traditional educational role for it.  Certainly, the Superintendent of Schools had ultimate authority to assign employees to jobs, and he claims to have delegated it all to Colon as to the acts at issue.  What Amato did, when he delegated *carte blanche* authority to Colon, was to create a policy of non-enforcement of equal opportunity laws, contractual obligations and constitutional protections.  He also created a policy-maker in Colon.

Monell is more important in considering whether a lower-level employee's conduct gives rise to a claim against the municipality.  It is not helpful in a case against those with authority to control the terms and conditions of employment.  If the jury accepts defendants' assertion that Colon acted unilaterally, based on a grant of *carte blanche*, then final decision-making authority was delegated to him, and the City can be held liable for his exercise of that authority.  If Amato had that authority, then his actions are attributable to the City.

Plaintiff can also prevail against the municipal employer by showing a pattern or practice of silencing protected speech, such as the threats to her husband and to other coaches and FMs that it would be "an act of insubordination" to oppose any initiative of the superintendent or to utilize school property to communicate any position contrary to "school system views."

As to the argument that the City should not be held liable under the discrimination statutes, plaintiff is required to bring these claims against her employer.  Tomka v. Seiler Corp., 66 F.3d 1295 (2nd Cir. 1995).  The City has issued IRS W2 forms to plaintiff each year, in which it names itself as her employer.  LaPenna Affid. ¶46.  So by its own admission, the City is the employer.  Under Connecticut law, a teacher is an employee of both a board of education and the municipality.  *See*, Conn.Gen.Stat. §10-241;  Cheshire v. McKenney, 182 Conn. 253 (1980);  Board of Education v. Connecticut State Employees Retirement Commission, 210 Conn. 531, 537 (1989).  There is nothing to the contrary in the language or history of Special Act 97-4.

The City can be held liable for the actions of the State Board of Trustees.  Under Section

4(d) of Special Act 97-4, the City is responsible for all liabilities incurred by the State Board of Trustees.

## VI.     THE HARTFORD PUBLIC SCHOOLS IS A PROPER DEFENDANT.

Defendants assert that Hartford Public Schools is not a proper defendant in this matter, under the reasoning applied by Hon. Peter C. Dorsey of this District in <u>Lee v. City of Hartford /Hartford Public Schools</u>.  In fact, in ruling on summary judgment in that case (after defendants filed the instant Motion), Judge Dorsey determined that Hartford Public Schools is an entity separate and distinct from the City of Hartford, and that it is a proper defendant in an employment-related claim by an HPS administrator.  That decision is attached hereto.  "Hartford Public Schools" is the name of the school district, according to the written policy published by the State Board of Trustees.  Meyer Affid. ¶8 and Exh. 2.  "Hartford Public Schools" is a body corporate, with the power to sue and be sued, pursuant to Conn.Gen.Stat. §§20-240 and 20-241, according to this policy.   Hartford Public Schools is an appropriate defendant.

## CONCLUSION

For all the foregoing reasons, the Motion for Summary Judgment should be denied.


RESPECTFULLY SUBMITTED,
PLAINTIFF


By ____/s/_____
Judith D. Meyer

Law Office of Judith D. Meyer  •  P.O. Box 451, Avon, CT 06001  •  (860) 678-7711
41