UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JANICE LAPENNA | : | CIVIL ACTION |
| | : | MASTER DOCKET |
| Plaintiff, | : | 3:02CV753 (SRU) |
| v. | : | |
| | : | |
| CITY OF HARTFORD, HARTFORD | : | |
| PUBLIC SCHOOLS, STATE BOARD | : | |
| OF TRUSTEES FOR THE HARTFORD | : | |
| PUBLIC SCHOOLS, ANTHONY | : | |
| AMATO, JUNE BERNABUCCI | : | |
| and JOSE COLON-RIVAS | : | |
| Defendants. | : | |
| | : | |

| | | |
|---|---|---|
| JANICE LAPENNA | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:03CV1126 (SRU) |
| v. | : | |
| | : | |
| JOSE COLON-RIVAS | : | |
| Defendant. | : | January 20, 2004 |

## LOCAL RULE 56(a)2 STATEMENT

### A.  PLAINTIFF'S RESPONSE TO DEFENDANTS' ASSERTED UNDISPUTED FACTS

Plaintiff responds as follows to the Defendants' Rule 56(a)(1) statements of facts they contend are undisputed.

1.    Plaintiff is a female physical education teacher at Hartford Public High School ("HPHS").  Her date of birth is August 28, 1951 and, thus, she was over the age of 40 during all times relevant to this action.  Transcript of the April 14, 2003 Deposition of Janice LaPenna ("LaPenna Tr."), attached hereto as Exhibit A, at 7; Plaintiff's Responses to Defendants' First

Set of Interrogatories and Requests for Production Directed to Plaintiff, relevant portions of which are attached hereto as Exhibit B, at Response to Interrogatory 14.

**RESPONSE:  ADMITTED.**

2.      The City of Hartford is a municipality in Connecticut.

**RESPONSE:  ADMITTED.**

3.      The Hartford Public Schools is the name of the Hartford school district.

**RESPONSE:  ADMITTED.**

4.      Anthony Amato was the Superintendent of Schools in Hartford from April of 1999 to late October or early November of 2002.  He is now the Superintendent of Schools in New Orleans, Louisiana.  Transcript of the June 3, 2003 Deposition of Anthony Amato ("Amato Tr."), relevant portions of which are attached hereto at Exhibit C, at 6, 10-11.

**RESPONSE:  ADMITTED.**

5.      June Bernabucci is the Director of Unified Arts for the Hartford Public Schools.  In that role, she oversees music, art, physical education and athletics for the Hartford Public Schools. As such, she serves as the Athletic Director for the Hartford Public Schools.  Transcript of the May 16, 2003 Deposition of June Bernabucci ("Bernabucci I Tr."), attached hereto as Exhibit D, at 6; November 13, 2003 Affidavit of June Bernabucci ("Bernabucci Aff't."), attached hereto as Exhibit E, at ¶2.

**RESPONSE:  ADMITTED.**

6.      Jose Colon-Rivas ("Dr. Colon") was the principal of HPHS during the 2000-2001 school year.  Amato Tr. at 18; Second Amended Complaint ("Complaint") at ¶8.

**RESPONSE:  ADMITTED.**

7.      In 1997, the Connecticut Legislature passed Special Act 97-4 which, <u>inter alia</u>, dissolved the Hartford Board of Education effective June 1, 1997 and legislated that "[t]he State Board of Trustees for the Hartford Public Schools . . . shall be solely responsible for the management of the Hartford School District."  Special Act 97-4(2); <u>see also</u>, Special Act 97-4(4)(a)(1) (The State Board "shall be responsible for all aspects of school district governance and management . . .") [Attached hereto as Exhibit G].

**RESPONSE:  ADMITTED.**

8.      The State Board continued to manage the Hartford school district through December 2, 2002.  <u>See</u>, Special Act 01-7(2)(B), attached hereto as Exhibit H.

**RESPONSE:  ADMITTED.**

**<u>The Impending Loss of Accreditation</u>**

9.      In 2000, HPHS was in danger of losing its accreditation from the New England Association of Secondary Schools ("NEASC").  Amato Tr. at 16-18.

**RESPONSE:  ADMITTED.**

10.     Based on his conversations with the NEASC Board, it was clear to Anthony Amato that HPHS would lose its accreditation in 2000.  Amato Tr. at 18.

**RESPONSE:  ADMITTED.**

11.     Anthony Amato asked the NEASC Board for one additional year in which to accomplish accreditation for HPHS.  That request was granted.  Amato Tr. at 18.

**RESPONSE:  ADMITTED.**

12.     In the summer of 2000, Mr. Amato asked Dr. Colon to assume leadership of HPHS and gave him one year in which to attain accreditation.  Amato Tr. at 18; <u>see also</u>, Transcript of the May 15, 2003 Deposition of Jose Colon-Rivas ("Colon Tr."), relevant portions of which are attached hereto as Exhibit F, at 47, 106.

**RESPONSE:  ADMITTED.**

13.     Dr. Colon told Mr. Amato that he wanted to make changes in the school and wanted to reassign certain teachers out of HPHS in order to better prepare the school for accreditation.  Mr. Amato supported Dr. Colon with respect to such issues.  Amato Tr. at 18-19, 24-26; Colon Tr. at 59.

**RESPONSE:  DENIED.  There is evidence that Mr. Amato made the decision to transfer teachers out of HPHS before he asked Dr. Colon to be its principal, as set forth more fully below in Section B, Genuine Issues of Material Fact ("GIMF") at 1. a.  Regardless of who had the original idea to transfer teachers, generally, plaintiff disputes whether it was Dr. Colon who decided to transfer <u>her</u> out of HPHS.  Based upon the testimony of former HPHS Principal Joseph Wall, and what Mr. Amato and Dr. Colon told the President and Vice President of the Hartford Federation of Teachers ("HFT" or the "Union"), a reasonable fact finder could conclude that it was Mr. Amato who decided to transfer teachers out of HPHS. Wall Tr. at 22-26, 65-68; Affid. Vargas ¶¶4-11; Affid. Hagan ¶¶14-22.  The current statements of Mr. Amato and Dr. Colon do not created undisputed facts, but rather create disputed issues even when compared to their own former statements.**

14.    Mr. Amato did not recommend that Dr. Colon reassign any teachers.  Colon Tr. at 106.

**RESPONSE:  DENIED. Plaintiff disputes that Mr. Amato did not recommend these transfers, based upon Mr. Wall's testimony and the Affidavits of Mr. Vargas and Mr. Hagan, as set forth in response to 13, above.**

Plaintiff's Reassignment and Return to HPHS

15.    Dr. Colon made the decision to reassign Plaintiff and another female physical education teacher from HPHS to other schools.  Colon Tr. at 88-89.

**RESPONSE:  DENIED.   Dr. Colon's contemporaneous statements defy this.  He admitted to the President and Vice President of the Union that he did not make the decision to transfer plaintiff, but either Bernabucci did or it was made downtown (at the HPS central administrative offices).  Vargas Affid. ¶¶10;  Hagan Affid. ¶¶22.  He told that to Elizabeth Gunn, as well.  Gunn Affid. ¶5.  He also expressly told plaintiff that the decision was made at the central office, because she had made an enemy and her mouth had gotten her into trouble.  He further told plaintiff and the other transferred Physical Education teacher, Cynthia Turcotte, that he was unable to transfer them back to HPHS in August because there were "powers greater than his," and because June Bernabucci said he could not.  LaP Affid. ¶¶25-27, 30;  Turcotte Affid. ¶¶9-11.**

16.    On or about July 27, 2000, Plaintiff learned that she would be reassigned from HPHS to Noah Webster Elementary School.  LaPenna Tr. at 63-64, 67.

**RESPONSE:  ADMITTED.**

17.    The first day of school for the 2000-2001 school year was August 28.  Complaint at ¶33.

**RESPONSE:  ADMITTED.**

18.     After speaking with Plaintiff, other physical education teachers and at least one parent,

Dr. Colon realized that he had made a mistake and decided that he needed to return Plaintiff to

HPHS.  Colon Tr. at 110, 139.

**RESPONSE: DENIED.  Plaintiff does not dispute that it was a mistake to transfer her out**

**of HPHS, and that Dr. Colon was aware of that as soon as he met and spoke with her --**

**indeed, he told her that and appeared genuine, and everyone who had ever evaluated her**

**or provided feedback told her she did an excellent job for HPHS.  *See*, Holloway Affid.**

**¶¶6-14, Exhibits A-D; LaPenna Affid. ¶45 and Exh. B; But she does dispute whether it was**

**Dr. Colon's own mistake or he was recognizing the harm done by someone else, and**

**attempting to keep an excellent teacher in his school, as he represented to her at the time.**

**Dr. Colon has admitted he did not even know Ms. LaPenna, or her stellar record as a**

**teacher and Faculty Manager, and he had no reason to transfer her out.  Colon Tr. 57.**

**Plaintiff does not dispute that Dr. Colon said he would make efforts to rescind the transfer;**

**and that he then told her he had been unable to do so because of "powers greater than his."**


19.     According to Plaintiff, on September 11, 2000, Plaintiff received a telephone call from

Dr. Colon (and, allegedly, was told that June Bernabucci was on the line, but never spoke to Ms.

Bernabucci) and offered the opportunity to return to HPHS as a teacher only.  Plaintiff did not

respond to such offer.  LaPenna Tr. at 79-80; Complaint at ¶37.

**RESPONSE: DENIED.  Admit that plaintiff received such a telephone call, but <u>deny she</u>**

**did not respond to an offer.  Defendant has distorted her testimony.  Plaintiff testified, in the cited pages of her Deposition, that this call came between classes and she felt blind-sided by it;  that she knew the transfer and the removal from her Faculty Manager position were in clear and blatant violation of her contract and a grievance was already pending; and that she called Union Vice President Bill Hagan for advice and was told to "leave it alone for now."  Conditioning her return to HPHS upon waiving her right to the Faculty Manager position for that school year was unfair and unreasonable, and plaintiff had no obligation to accept it, nor was she required to decline a return to HPHS.**

20.     According to Plaintiff, on September 22, 2000, Plaintiff received another telephone call from Dr. Colon asking whether she would return to HPHS.  Plaintiff said that she would have to speak to her union.  Her union instructed her to report to work at HPHS on September 25, 2000. LaPenna Tr. at 80-81; Complaint at ¶¶38-39.

**RESPONSE: ADMITTED.**

21.     On or about September 25, 2003, plaintiff returned to HPHS as a physical education teacher.  Complaint at ¶40.

**RESPONSE:  ADMITTED.**

**The Faculty Manager Position**

22.     Each of the three public high schools in Hartford employed one Faculty Manager.  <u>See</u>, Bernabucci I Tr. at 86; Transcript of the June 3, 2003 Deposition of June Bernabucci ("Bernabucci II Tr."), relevant portions of which are attached at Exhibit D, at 61; Bernabucci Aff't. at ¶3.

**RESPONSE:  ADMITTED.**

23.     The Faculty Manager position was an extracurricular or extra-duty assignment.  LaPenna

Tr. at 20; Bernabucci Aff't. at ¶4.

**RESPONSE:  ADMITTED.**

24.     Under the relevant collective bargaining agreements, the Faculty Manager's term is two

years.  At the end of the term, the position is posted and eligible applicants are free to apply for

the position.  LaPenna Tr. at 131; Bernabucci I Tr. at 17, 19-20, 104 & Exhibit 7 thereto.

**RESPONSE: Admit, except that the two-year contract term was new in the collective**

**bargaining agreement that started July 1, 1999, so that the term was to expire on June 30,**

**2001 and plaintiff could not be removed from the position in August, 2000 without just**

**cause.  LaPenna Affid. ¶x; Bernabucci I Tr. pp. 57; Stacy Tr. pp. 83-87.**

25.     In December of 1996, Plaintiff became the Faculty Manager at HPHS.  LaPenna Tr. at

17-19.

**RESPONSE:  ADMITTED.**

26.     As described by Plaintiff, the Faculty Manager at HPHS served as a liaison between the

athletic coaches and the Athletic Director's office.  LaPenna Tr. at 19-20;  see also, Bernabucci I

Tr. 82-83, 95-96 & Exhibits 5 & 7 thereto; Bernabucci Aff't. at ¶5.

**RESPONSE:  ADMITTED.**

27.     In effect, the Faculty Manager serves as the on-site representative of the Athletic Director

at each high school.  Bernabucci Aff't. at ¶6.

**RESPONSE:  ADMITTED with the limitation that the job description provides the duties,**

**as set forth more fully below.**

28.     As a result of her reassignment out of HPHS, Ms. Bernabucci felt that Plaintiff could no longer perform the duties of Faculty Manager because she was not physically located at HPHS. Bernabucci I Tr. at 24-28, 81.

**RESPONSE: DENIED.  Plaintiff disputes that Ms. Bernabucci felt this as a result of the transfer.  Ms. Bernabucci herself testified that if Dr. Colon had agreed to it, Ms. LaPenna might have been able to perform the Faculty Manager job;  she did not know;  and that either Dr. Colon or Frank Dumont was the decision maker.  Bernabucci I Tr. 55-57.  As set forth more fully below, given the contradictory testimony of the defendants and the totality of the circumstances, a reasonable fact finder could conclude that Ms. Bernabucci caused plaintiff to be transferred so that she would have an excuse, valid or otherwise, to remove plaintiff from her position as Faculty Manager in retaliation for her efforts to create communications between Mr. Amato and the coaches regarding the SSA issue.  It is also rational to believe that Bernabucci was motivated to provide retention incentives to younger male employee David Hodge, who had problems with his school administration, at the expense of an older female employee.**

29.     Plaintiff recalls that Freeman Burr, the principal at Noah Webster, did not object to Plaintiff continuing as the Faculty Manager at HPHS as long as such activities did not interfere with her teaching classes.  LaPenna Tr. at 71-72.

**RESPONSE:  ADMITTED.**

30.     Ms. Bernabucci recalls that Freeman Burr, the principal of Noah Webster, indicated that

he could not allow Plaintiff to leave his school early because he needed her to teach classes until the end of the school day. Bernabucci I Tr. at 109-111.

**RESPONSE: DENIED. Freeman Burr testified at the CHRO that nobody ever asked him about this. LaPenna Affid. ¶42.**

31.     Plaintiff admits that there was no precedent for a person serving as a Faculty Manager for a high school while assigned to teach at another school. LaPenna Tr. at 73.

**RESPONSE: DENIED. In fact, after the date of plaintiff's deposition, she learned that the Faculty Manager at Weaver High School teaches at West Middle School, with Ms. Bernabucci's apparent blessing, so she was mistaken at the time of her Deposition and HPS had deceived her. Louis LaPenna Affid. ¶¶29-30. Plaintiff asserts that she had been Faculty Manager at HPHS for four years already, and was quite certain that she could perform the job quite well even while teaching at Webster Elementary School. LaPenna Affid. ¶¶5-8. It is June Bernabucci who apparently knows little to nothing about how a Faculty Manager actually performs her job: she does not appear to know whether a Faculty Manager, as a full time high school teacher, had a home room to teach in 2000, has required administrative obligations in addition to her five teaching periods each day, and is otherwise working full time during the school day; she does not know whether it would be helpful to a Faculty Manager to have the first two periods of the day free, as Ms. LaPenna would have, essentially, while working at Webster School. Bernabucci I Tr. 85-87. The truth is, most of the Faculty Manager's job duties can be performed first thing in the morning, evenings and weekends, as plaintiff had done before, and plaintiff could have**

**performed the job well even while teaching at Webster School.**  LaPenna Affid. ¶¶5-8.

32.    David Hodge, a white male under the age of 40, was reassigned into HPHS as a physical

education teacher.  See, Bernabucci II Tr. at 88.

**RESPONSE:  ADMITTED.**

33.    Mr. Hodge was appointed the acting Faculty Manager at HPHS.  Bernabucci I Tr. at 74;

Bernabucci II Tr. at 56; Colon Tr. at 137-138.

**RESPONSE:  ADMITTED.  And in knowing, flagrant and deliberate disregard of**

**plaintiff's contract rights.**

34.    During the time that Dr. Colon was attempting to return Plaintiff to HPHS, Mr. Hodge

voluntarily left his assignment as a physical education teacher to take an assignment as a math

teacher at HPHS.  Bernabucci II Tr. at 93-94; see also, Colon Tr. at 149.

**RESPONSE:  ADMITTED.**

35.    After Plaintiff's return to HPHS, Mr. Hodge continued to function as the Acting Faculty

Manager.  See Colon Tr. at 156-157, 181.

**RESPONSE:  ADMITTED.**

36.    Plaintiff filed a grievance over her not returning to the extracurricular Faculty Manager

assignment.  LaPenna Tr. at 81.

**RESPONSE:  ADMITTED.**

37.    Plaintiff's grievance was settled and Plaintiff was paid for the Faculty Manager

assignement through the end of the 2000-2001 school year.  LaPenna Tr. at 129-131; Bernabucci

I Tr. at 59.

**RESPONSE: DENIED.  Plaintiff's grievance was not settled, nor was she paid any of her salary for the position through the end of the 2000-2001 school year.  Plaintiff admits that on or about <u>May 10, 2002</u>, after this law suit had been filed, and months after she sought an EEOC Right-to-Sue letter and a CHRO dismissal so that she could file it, and on the eve of the arbitration of her grievance, she was paid the salary for the Faculty Manager position for the 2000-2001 school year, without interest.**

<u>The 2001 Interview for the Faculty Manager Position</u>

38.    In the Spring of 2001, the Faculty Manager extracurricular position at HPHS was posted and both Plaintiff and Mr. Hodge applied for it.  LaPenna Tr. at 131-132 & Exhibit 5 thereto; Bernabucci Aff't. at ¶¶7-8.

**RESPONSE:  ADMITTED.**

39.    Interviews for Faculty Manager were conducted before June Bernabucci and various coaches and physical education teachers at HPHS, specifically:  Ezequiel Alejandro, Lindy Remigino, Margery Jackson, Aida Ramos, Cindy Turcotte and Helen Gray.  LaPenna Tr. at 133 & Exhibit 6 thereto; Bernabucci Aff't. at ¶¶9-10.

**RESPONSE:  ADMITTED.**

40.    When she interviewed for the Faculty Manager position in 2001, Plaintiff described her performance in the interview as "lousy."  LaPenna Tr. at 135.

**RESPONSE:  ADMITTED.**

41.    She said that she had an uncontrollable visceral reaction to seeing David Hodge and had a similar reaction to seeing June Bernabucci.  LaPenna Tr. at 131-134.

**RESPONSE:  ADMITTED.**

42.    Despite advice from others, plaintiff went to this interview "very unprepared."  LaPenna

Tr. at 135, 138-139.

**RESPONSE:  ADMITTED.**

43.    In the interview, plaintiff made a "bad professional decision by letting my emotions get

in the way of that interview."  LaPenna Tr. at 140.

**RESPONSE:  ADMITTED.**

44.    According to Plaintiff, Mr. Alejandro and Ms. Turcotte voted in favor of Plaintiff for the

Faculty Manager position, while the remaining members of the interview panel voted in favor of

Mr. Hodge.  LaPenna Tr. at 142;  see also, Bernabucci Aff't. at ¶12.

**RESPONSE:  ADMITTED.**

45.    Ms. Bernabucci did not cast a vote.  Bernabucci Aff't. at ¶11.

**RESPONSE:  ADMITTED.**

46.    Thereafter, Mr. Hodge was selected for the Faculty Manager position for the 2001-2003

time period.  LaPenna Tr. at 127;  Bernabucci Aff't. at ¶13.

**RESPONSE:  ADMITTED.**

47.    Plaintiff filed a grievance over her non-selection for the Faculty Manager position in

2001.  However, her union advised her to drop the grievance.  LaPenna Tr. at 147-148.

**RESPONSE:  ADMITTED.**

Mr. Amato's Involvement

48.    Plaintiff has sued Anthony Amato because he was the Superintendent of Schools.

LaPenna Tr. at 21-22.

**RESPONSE:  DENIED.  Plaintiff has sued Anthony Amato because he violated her rights under the First and Fourteenth Amendments to the United States Constitution and under Conn.Gen.Stat. §31-51q, under Title VII and under the ADEA, in that he ratified and acquiesced in retaliatory and discriminatory conduct and he acted with reckless disregard for her legal rights and/or gross negligence and/or set a policy of *carte blanche*, for a delegated decision maker.  Defense counsel's attempt to use plaintiff's lay responses to objected-to questions on legal issues should be ignored.**

49.     Plaintiff is unaware of any actions that Anthony Amato took against her, other than "signing" her reassignment.  LaPenna Tr. at 22-24.

**RESPONSE: DENIED.  Mr. Amato violated plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution and under Conn.Gen.Stat. §31-51q, under Title VII and under the ADEA,in that he ratified and acquiesced in retaliatory and discriminatory conduct and he acted with reckless disregard for her legal rights and/or gross negligence and/or set a policy of *carte blanche*, for a delegated decision maker. Defense counsel's attempt to use plaintiff's responses to objected-to questions on legal issues should be ignored.**

50.     In fact, Anthony Amato did not have any involvement in the decision to reassign plaintiff.  Amato Tr. at 17-19, 73-74; Colon Tr. at 106.

**RESPONSE: DENIED.  A reasonable fact finder may find, for the reasons set forth in 13 and 14 above, that the idea for the transfers was Mr. Amato's in the first place.  Further,**

**even if one were to accept the defendants' claim that it was Dr. Colon who wanted to transfer teachers out, Dr. Colon alone did not have authority to transfer these teachers; ultimately, it was Mr. Amato's decision to "support" the transfers. Amato Tr. pp. 17-19, 25-27. Only he had authority to do it, according to Director of Labor Relations Frank Dumont. Dumont Tr. pp. 53-56. He was therefore involved in the decision. It was Anthony Amato who reassigned plaintiff.**

51.     Dr. Colon went to Mr. Amato and told him that he had decided to bring back Plaintiff and the other female physical education teacher to HPHS. According to Dr. Colon, Mr. Amato did not want to know who the individuals were who would be reassigned back to HPHS. Mr. Amato was "fine" with Dr. Colon's decisions. Colon Tr. at 184.

**RESPONSE: DENIED in part. Plaintiff notes that Mr. Amato testified he had nothing to do with any decision to transfer any teacher back to HPHS. Amato Depo 73-74. Dr. Colon had told plaintiff and Ms. Turcotte that he had been unable to transfer them back because there were "powers greater than his," as set forth in 15 and 16, above. Perhaps that is why he had to go to Mr. Amato to have the transfers rescinded. Plaintiff does not deny that Colon did go to Amato and get permission to transfer her back to HPHS.**

52.     Dr. Colon never discussed the Faculty Manager issue with Mr. Amato. Colon Tr. at 184-185.

**RESPONSE: Plaintiff admits Dr. Colon testified to this effect.**

53.     Plaintiff never had a conversation with Mr. Amato and, with the exception of an October 8, 1999 memo from athletic coaches to Mr. Amato (which Plaintiff did not sign), never

corresponded with Mr. Amato.  LaPenna Tr. at 84.

**RESPONSE:  ADMITTED.**

54.    Mr. Amato does not remember Plaintiff.  Amato Tr. at 13-14, 16.

**RESPONSE: Plaintiff admits Mr. Amato testified to this effect.**

Ms. Bernabucci's Involvement

55.    Ms. Bernabucci was not involved in the decision to reassign Plaintiff out of HPHS.

Bernabucci I Tr. at 127-129.

**RESPONSE: DENIED.  Ms. Bernabucci was directly involved in the decision, according to**

**Dr. Colon's statements to Edwin Vargas and Bill Hagan and plaintiff.  Hagan Affid. ¶22.**

56.    Ms. Bernabucci objected to the reassignment of Plaintiff out of HPHS.  Bernabucci I Tr.

at 128-133.

**RESPONSE: DENIED.  Ms. Bernabucci's claim that she was not involved is defied by Dr.**

**Colon's statements as set forth in 55, above and also at Colon Tr. 161-62.**

Plaintiff's First Amendment Claim

57.    Plaintiff alleges that she had conversations with June Bernabucci concerning issues

related to the Sports Sciences Academy.  Plaintiff did not recall the number of conversations or

the contents of such conversations.  LaPenna Tr. at 26-28.

**RESPONSE: DENIED.  Plaintiff disputes this distortion of her testimony.  She testified**

**that she could not remember the exact number of conversations she had with Bernabucci**

**about this topic, or the exact words spoken, but she had been a "spokesperson for a**

**number of coaches that had concerns regarding the Sports Sciences Academy," and that**

**her conversations led to a very emotional meeting with the three Faculty Managers and then-Superintendent Dr. Benjamin Dixon, at the offices of the Board of Education.  Former Bulkeley High School Principal Paul Stringer was an outspoken opponent of the plan to include the Sports Sciences Academy teams in the interscholastic competitions.  LaPenna Tr. 26-30 (attached to Defendants' Rule 56a(1) Statement); LaPenna Affid. ¶¶13-16.  After she wrote the October 8, 1999 Petition to Mr. Amato, her relationship with Bernabucci went downhill, and Bernabucci was no longer cordial to her, would walk past her without speaking and would not take her telephone calls.  *Id.* ¶¶17-22.**

58.     At a meeting with then-Interim Superintendent, Ben Dixon, some Hartford Public Schools employees, spearheaded by Paul Stringer, a principal in the Hartford Public Schools, discussed Sports Sciences Academy, a charter school located in Hartford, and the scheduling of athletic contests.  LaPenna Tr. at 27-30.

**RESPONSE:  ADMITTED.**

59.     At this meeting with then-Interim Superintendent Ben Dixon, Plaintiff spoke about her history in Hartford but did not advocate any particular position.  LaPenna Tr. at 30-32.

**RESPONSE: DENIED.  Plaintiff disputes this distortion of her testimony.  Plaintiff testified that she made a remark that "because of [her] background ... growing up in Hartford, having attended Hartford Public High School ... I took it very personal the tradition that we had between the three high schools ..."  She further testified that she could not remember verbatim every word she spoke, but she mostly listened to Mr. Stringer and others.  See response to 58, above.**

60.    After this meeting, Plaintiff did not have any conversations with June Bernabucci or any other administrator regarding the Sports Sciences Academy.  LaPenna Tr. at 31-32.

**RESPONSE: DENIED.  Plaintiff testified that she did not recall specifics of her conversations, but she knows she had spoken about the subject to administrators, and they may have been Vice Principal Harry Holloway, Vice Principal Emanuel Santiago and/or Principal Joseph Wall.  LaPenna Tr. 44-47.  Moreover, plaintiff certainly spoke about the SSA issue when Bernabucci summoned her to the inquisition described below, although it was no "conversation" or discussion.**

61.    Plaintiff testified that she sent correspondence to Superintendent Amato.  LaPenna Tr. at 34 & Exhibit 3 thereto.  The correspondence is dated October 8, 1999 and is addressed to defendant Amato and is from the "Athletic Coaches of the Hartford Public High Schools." LaPenna Tr. at Exhibit 3.

**RESPONSE:  ADMITTED.**

62.    Plaintiff did not sign the correspondence, nor was she a coach at that time.  LaPenna Tr. at 34.

**RESPONSE: DENIED.  Plaintiff did not write her signature on the Petition, as she was not a coach, but she wrote it, and she was named in it as the contact person to schedule a meeting with Mr. Amato.  LaPenna Affid. ¶¶17-19.  Defendants clearly believed plaintiff was responsible for the Petition, as Bernabucci summoned her for the inquisition.**

63.    In the correspondence itself, the coaches did not advocate any position.  Rather, the coaches simply asked for a meeting with Superintendent Amato.  LaPenna Tr. at 41-42 &

Exhibit 3 thereto.

**RESPONSE: ADMITTED.  At the same time, Mr. Amato understood the document to be an indication that the coaches were not supportive of his position.  Amato Depo. p. 57.**

64.     Plaintiff was never contacted regarding this correspondence and does not recall discussing it with any administrator, including Ms. Bernabucci and Mr. Amato.  LaPenna Tr. at 42-43.

**RESPONSE:  ADMITTED.**

65.     Plaintiff does not recall discussing her views regarding the Sports Sciences Academy and the scheduling of athletic contests against teams from the Sports Sciences Academy with any administrator.  LaPenna Tr. at 43.

**RESPONSE: DENIED.  See 60, above.**

66.     The only issues of public concern that plaintiff recalls speaking out on were confined to issues regarding the inclusion of the Sports Sciences Academy in athletic contests.  LaPenna Tr. at 44-47.  She does not recall any of the specifics of her speech regarding these issues.  LaPenna Tr. at 45-46.

**RESPONSE: DENIED.  Plaintiff testified that since Attorney McQuade was questioning her about the Amended Complaint, the matter of public concern she was discussing was the one that gave rise to this case;  and she testified her concern had to do with the students and children in the City of Hartford and the people that work with them, the coaches;  so when the coaches have a concern about their programs it's also her concern.  *Id.* at 44.**

Plaintiff's Sex Discrimination Claim

67.     Plaintiff's "evidence" of sex discrimination by Mr. Amato or Ms. Bernabucci is that a

male replaced her as the Faculty Manager at HPHS when she was temporarily reassigned to an

elementary school.  LaPenna Tr. at 85-87, 90.  Plaintiff is unaware of any pattern of sex

discrimination by either Mr. Amato or Ms. Bernabucci.  LaPenna Tr. at 91; see also, 101.

**RESPONSE: DENIED.  Plaintiff was removed from her position as Faculty Manager**

**permanently, in defiance of a clear contractual right to the position, a past practice of not**

**removing teachers from extracurricular assignments due to a transfer as a teacher, and**

**excellent performance;  she was not permitted to continue in that position while she was at**

**Webster Elementary School although she could have performed it well;  and she was not**

**returned to the position when she was transferred back to HPHS less than a month into the**

**school year.  The position was given to a much younger male.  A male teacher has been**

**permitted to be Faculty Manager at one school while teaching at another, as set forth more**

**fully below, but defendants claim plaintiff could not have done this.  Furthermore, when**

**asked why plaintiff was not returned to the position of Faculty Manager even after she was**

**transferred back to HPHS, defendants stated it would have been unfair to Mr. Hodge!**

**LaPenna Affid. ¶38.  Hodge was the "Acting" Faculty Manager, according to defendants.**

**Bernabucci II Tr. 39.  Plaintiff had a clear contractual right to the position and had**

**performed it excellently for four years, but the fairness to this woman was apparently**

**immaterial:  apparently defendants believe they need to be "fair" only to a man and not a**

**woman.  Defendants have not articulated any reason that is worthy of credence, either for**

**transferring Ms. LaPenna out of HPHS, or for refusing to permit her to perform the**

**Faculty Manager job after the transfer, or for refusing to return her to the position when she returned to HPHS.  These decisions are attributable to Mr. Amato.  In addition, they were expressly attributed to Ms. Bernabucci by Dr. Colon, as set forth above, and to Dr. Colon by Ms. Bernabucci.  There is much reason to suspect mendacity, as defendants' proffers cannot all be true.  All of this is evidence of disparate treatment of a woman's rights as compared to a man's, or gender discrimination.**

Plaintiff's Age Discrimination Claim

68.    Plaintiff's "evidence" of age discrimination consists of:  (a) the fact that the person who replaced her as Faculty Manager at HPHS after her temporary reassignment to an elementary school is under 40 and younger than plaintiff; (b) an alleged remark of Dr. Colon that he wanted "new blood" in the school; (c) the Hartford Public Schools' hiring of Anthony Menard, a "young male from outside of the school system," to be the boys basketball coach at Weaver High School; (d) the alleged hiring of Rudy Alvarez to be the boys basketball coach at Bulkeley High School; and (e) the hiring of Ed Quick as the boys basketball coach at HPHS.  LaPenna Tr. at 94-100.

**RESPONSE: DENIED.  Plaintiff was removed from her position as Faculty Manager in defiance of a clear contractual right to the position and excellent performance, as set forth above.  She was not permitted to continue in that position while she was teaching at Webster Elementary School, although she could have performed it well;  she was not returned to the position when she was transferred back to HPHS less than a month into the school year.  The position was given to a much younger male.  Furthermore, when asked**

**why plaintiff was not returned to the position of Faculty Manager even after she was transferred back to HPHS, defendants asserted it would have been <u>unfair to Mr. Hodge</u>! Hodge was the "Acting" Faculty Manager, according to defendants. That position does not exist in any contract. Plaintiff had a clear contractual right to the position, and had performed it excellently for four years, but the fairness to plaintiff, an older employee, was apparently immaterial to the defendants: apparently defendants believe they need to be "fair" only to a younger teacher and not an older one. That is evidence of age discrimination. Defendants have not articulated any reason that is worthy of credence for transferring Ms. LaPenna out of HPHS, or for refusing to permit her to perform the Faculty Manager job after the transfer, or for refusing to return her to the position when she returned to HPHS. These decisions are attributable to Mr. Amato and were expressly attributed to Ms. Bernabucci by Dr. Colon and to Dr. Colon by Ms. Bernabucci, as set forth above. All of this is evidence of age discrimination.**

69.    Plaintiff alleges that Dr. Colon used the term "new blood" at her CHRO hearing. However, Plaintiff does not know what Jose Colon allegedly meant by the term "new blood" or the context in which it was used. LaPenna Tr. at 95-96.

**RESPONSE: ADMITTED, except that Dr. Colon directly admitted that the phrase "new blood" was his own.** Colon Tr. 44-45.

70.    Plaintiff does not recall who hired Anthony Menard but recalls that the Principal at Weaver High School, at the time, was Christine Mahoney. Mr. Menard lasted for one year as boys basketball coach at Weaver High School and was succeeded by plaintiff's husband, Lou

LaPenna, who was age 46 or 47 at the time.  LaPenna Tr. at 96-97.

**RESPONSE:  ADMITTED.**

71.     Plaintiff believes that Rudy Alvarez was hired to be the basketball coach at Bulkeley

High School, but does not know if he actually coached a game.  According to Plaintiff, a

grievance was filed and Eddy Griffin, a man in his fifties, was awarded the job.  LaPenna Tr. at

97-98.

**RESPONSE:  ADMITTED.**

72.     Plaintiff testified that Ed Quick was hired for the boys basketball coaching position at

HPHS approximately three years ago and that, she believes, another applicant applied for the

position but does not know the person's name.  LaPenna Tr. at 99-100.

**RESPONSE:  ADMITTED.**

73.     At the time of her deposition, Plaintiff testified that Matthew Steele, the Faculty Manager

at Weaver High School, was "about my age" and that Robert Raffalo, the Faculty Manager at

Bulkeley High School, was "older" than Plaintiff.  LaPenna Tr. at 94-95.

**RESPONSE:  ADMITTED.**

74.     At her deposition, plaintiff was unaware of any additional evidence of age discrimination.

LaPenna Tr. at 100.

**RESPONSE: DENIED.  Plaintiff was asked whether she was aware of other evidence of a**

**pattern of hiring younger people for athletic positions in Hartford.  In the cited transcript**

**portion, she did not testify she was "unaware of any additional evidence of age**

**discrimination."  This distortion of plaintiff's testimony is, itself, evidence of "guilty**

**awareness" on the part of defendants.  It is not particularly revelatory to ask a lay witness about "evidence of age discrimination," moreover, a question that is often disputed even among our courts.**

## B.  GENUINE ISSUES OF MATERIAL FACT

Plaintiff submits that the following genuine issues of material fact preclude summary judgment in this case.

### 1.  Who made the decision to transfer Janice LaPenna out of Hartford Public High School?

The defendants have provided contradictory testimony and statements as to who made the decision to transfer plaintiff out of her former position at Hartford High.  A fact finder would need to determine who made the decision, in order to determine the motives that led to plaintiff's loss of her former position.  The following identifies evidence from which a fact finder could rationally conclude that Mr. Amato, Ms. Bernabucci and/or Dr. Colon participated in, influenced or made the decision.

a.  There is evidence from which a jury could rationally infer that Mr. Amato made the decision.  Former HPS Superintendent Anthony Amato told then-Principal of HPHS Joseph Wall, at the end of the 1999-2000 school year, that he wanted to transfer a "core"[1] of teachers out of HPHS.  Wall Tr. pp. 65-69.  During this  discussion Amato also asked Wall who he would

---

[1]

Wall repeated this oral communication at his deposition, and did not know whether Amato meant to use the word "corps" or the word "core" of teachers.  For the current purposes plaintiff will use the word "core."

recommend to take his place, and Wall suggested Colon.  Regarding the proposed transfers, Wall suggested that Amato furlough the teachers of the Freshman Academy and giving them intensive training.  Amato said he would not have time for that.  Wall Tr. pp. 23-25.  <u>After</u> this time, when Amato disclosed to Wall his intent to transfer a core of teachers out of HPHS, Wall told Colon he would be leaving HPHS and they discussed whether Colon might consider becoming principal.  Colon Tr. pp. 16-18.  We know that Mr. Amato's disclosure that he intended to transfer a group of teachers out of HPHS came <u>before</u> Dr. Colon had any input into the matter, because <u>Dr. Colon expressly testified that Mr. Wall was already gone from the school when Mr. Amato spoke with him about taking over the school.</u>  *Id.*

b.  Amato told Edwin Vargas and Bill Hagan, President and Vice President of the Hartford Federation of Teachers, respectively, that <u>he</u> intended to transfer forty to sixty teachers out of HPHS.  When they protested that this would violate the teachers' contract, he was defiant, telling them "you have to do what you have to do."  Hagan Affid. ¶¶14-16.  But he added that he was going to hold HPHS's new Principal, Dr. Colon, responsible for obtaining NEASC accreditation, so if Vargas and Hagan could convince Colon not to transfer teachers, Amato would support Colon's decision.  Vargas Affid. ¶¶4-6; Hagan Affid. ¶18.  So the initial decision was Mr. Amato's, regardless of whether he gave Colon authority to modify it.

c.  Vargas and Hagan then met with Colon and discussed each individual teacher HPS proposed to transfer.  As to most of the individual proposed transferees, Colon willingly discussed the matter and changed the decision as to some.  But Colon told Vargas and Hagan <u>he did not make the decision to transfer Ms. LaPenna out of Hartford High</u>.  <u>Colon denied any</u>

involvement in the decision to transfer Ms. LaPenna and her colleague Cindy Turcotte;  and he told them June Bernabucci made that decision and they must speak with June Bernabucci to rescind their transfers, because the decision had been made at the central offices of HPS.  By contrast, Colon admitted to control over the decision to transfer other teachers on the original list, and he discussed rescinding the transfer of each of them.  Moreover, Colon said he had no reason to transfer LaPenna and Turcotte, as they are fine teachers, and if Vargas and Hagan could convince the central office, Colon would have no problem with their remaining at Hartford High.  Vargas Affid. ¶¶7-11; Hagan Affid. ¶¶19-23.

    d.  There is evidence also to support a finding that June Bernabucci made the decision that plaintiff should be transferred.  According to Mr. Hagan, Colon identified June Bernabucci specifically as the decision maker;  Mr. Vargas recalls only that he said the decision was made at the central office and not by him.  *Id.*  Regardless, plaintiff has produced sufficient evidence to rebut the defendants' claim that Colon unilaterally made the decision to transfer plaintiff.  There is a genuine issue of fact who made the decision to transfer plaintiff, which is directly material to the central material issue of motivation, and there is evidence to support a finding that it was Amato and/or that it was Bernabucci – even if Colon could have changed the decision.

    e.  Colon also told Janice LaPenna, in a meeting with her on August 1, 2000, that he had nothing to do with the decision to transfer her, that it was made at the Central Offices of HPS, that she had made an enemy, and that her mouth had gotten her into trouble.  LaPenna Affid. ¶¶24-25.  Dr. Colon testified at his deposition that he always tells the truth, whether under oath or not.  Colon Tr. pp. 5-6.

f.  Colon met with Ms. LaPenna and Cynthia Turcotte on or about August 14, 2000.
They asked him why he had "gone back on his word" to have their transfers rescinded.  He
responded that there were powers greater than his, and that <u>June Bernabucci</u> had told him he
could not have them transferred back to Hartford High.  Turcotte Affid. ¶¶9-11.  The idea that
Bernabucci was involved is further supported by defendants' proffered undisputed fact No. 51,
above.  They claim Colon had *carte blanche* to choose his team, yet he had to go to Mr. Amato
to get permission to have plaintiff's transfer rescinded.

g.  Based upon Colon's representations that <u>June Bernabucci</u> had made the decision, HFT
President Edwin Vargas met with her to ask that plaintiff's and Turcotte's transfers be rescinded.
Bernabucci did not deny that the transfers were her decision, nor did she suggest they were
anyone else's decision; but she was not willing to consider changing the decision.  She gave
Vargas the impression she regarded plaintiff and Ms. Turcotte as troublemakers, although she
would not provide any justification for the transfers.  Vargas Affid. ¶¶12-13.

h.  Colon told Elizabeth Gunn, another Physical Education teacher at HPHS who met
with him during the summer of 2000, that he had nothing to do with the decision to transfer
plaintiff and Turcotte, but that the decision had been made "downtown."  Gunn Affid. ¶6.

i.  In none of his meetings with plaintiff, Turcotte or Gunn did Colon <u>ever</u> suggest the
decision had to do with Joseph Wall, nor did he even remotely suggest he had participated in the
decision.  He discussed rescinding the transfers of other teachers with the HFT officers, but
indicated he could not do so as to plaintiff.  From this evidence, a rational jury could conclude,
directly contrary to the current assertions of the defendants, that Colon was not the decision

maker as to plaintiff.

j.  Bernabucci testified she was told of the decision to transfer plaintiff out of HPHS in July, only after Colon made the decision.  She said she objected, and told Colon he was losing both the Faculty Manager and a coach of three sports, but he insisted it had to be done.  Bernabucci Depo. pp. 129-32.[2]  This creates a genuine issue of material fact, as it directly contradicts Colon's contemporaneous statements to Vargas, Hagan, Gunn, Turcotte and plaintiff.  It also contradicts other testimony from Colon, that Bernabucci did not object.  Colon Tr. 161-62.

k.  There is reason, as set forth below, to infer that Bernabucci had become angry and hostile toward plaintiff because of her speech on a matter of public concern.

l.  Colon now claims that his chief concern was to make sure he had only teachers who would be great "team players," who he was sure would work well with him toward accreditation.  Colon Tr. 71-72, 55.  When Colon met with Janice LaPenna and Cindy Turcotte on August 14, 2000, he had never yet met David Hodge, so he could not rationally have made any decision whether Mr. Hodge was such a person. *Id.* pp. 66-67.  According to the transfer notice in David Hodge's personnel file, he was notified of his transfer to HPHS on August 10, 2000, before

---

[2]

Plaintiff is not offering this as true, but as evidence which contradicts that of another defendant, which the jury may or may not accept as true.  The jury could, in fact, decide, based upon some of her other testimony, that Bernabucci is entirely unworthy of credence and that she made the decision for reasons she seeks to conceal.  It could also decide that Colon is unreliable as a witness, and that both of them participated in the decision.  And from the "hot potato" treatment of the decision, which all of the defendants want to blame on someone else, a rational jury could infer guilty awareness of illegal action.

Colon ever met him, and before Colon asked Ms. LaPenna who he was. Meyer Affid. ¶4 and Exh. A. Interestingly, Hodge was threatening to leave the Hartford Public Schools altogether because he could not get along with the administration at SSA, where he had been a teacher and coach. Bernabucci I Tr. 32-33. So it appears unlikely that Colon made the decision to transfer Hodge into HPHS and make him Faculty Manager there because he personally determined Hodge would be a great "team player," for Hartford High, as opposed to plaintiff.

       m. Ultimately, Janice LaPenna and Cynthia Turcotte were transferred back to Hartford High. In justifying this action, HPS issued a memorandum that referred to the purpose of the transfer back as necessary for June Bernabucci "to save face with her staff." Neither the author of the document, Frank Dumont, nor Ms. Bernabucci could – or would – explain this. Dumont Tr. 72-79; Bernabucci II Tr. 84-88.

## 2. Why was Ms. LaPenna transferred out of Hartford High?

       Defendants' reasons for this decision have shifted over time. Currently, they assert that somehow the threat of loss of NEASC accreditation for Hartford High justified transferring plaintiff out of the school. Plaintiff does not deny the importance of obtaining accreditation, but submits that it bears no rational relationship to her transfer. Like the other reason asserted by the defendants over time, this is but one more pretextual reason for a decision motivated, at least in part, by gender and age discrimination, and retaliation for taking a position against Amato's and Bernabucci's decision regarding athletic programs at Hartford's high schools. In fact, the reasons proffered by the defendants have shifted over time, which is, in itself, evidence of pretext.

a.  HPHS's accreditation was threatened for a period of several years prior to the 2000-2001 school year.  Amato Tr. pp. 17-18.

b.  NEASC had cited numerous reasons why HPHS might not be accredited;  but NEASC had never suggested that any HPHS faculty should be transferred out.  Amato Tr. p. 24.  NEASC did not raise any concerns about the Physical Education program or athletic programs at HPHS, nor did anyone else.  Amato Tr. 23, 28-29; Colon Tr. 51-53, 108-09, 118-19.  Even Robert Henry, who was Chief of Staff for HPS at the time and is now Superintendent of Schools, knew of no reason for plaintiff's transfer, or the transfer of teachers out of HPHS in the summer of 2000, although he had overall responsibility for Human Resources for HPHS.  Henry Tr. 5, 13-14, 18-19, 34, 36, 40-41, 46.

c.  Mr. Amato claimed that the idea to transfer teachers out of HPHS was Dr. Colon's, and that it was for "programmatic purposes;"  but Mr. Amato did not know what those programmatic purposes were, as he had not discussed the matter in detail with Dr. Colon – another illogical response.  Amato Tr. pp. 25-27.  As set forth above, there is reason to disbelieve that it was Colon's idea and to believe it was Amato's.  In light of the fact that Colon had never been a principal before;  Colon Tr. p. 19;  and particularly in light of the genuine crisis the defendants are raising, which would appear to demand greater care in HPS's response, it strains credibility that Mr. Amato merely turned the reins over to Colon and gave him *carte blanche* to radically change the faculty without any articulated purpose, and without any effort to consider qualifications and past performance.  The defendants would have a jury accept that it was so important to give Colon *carte blanche*, that HPS did not examine his decisions for reason, logic,

discriminatory treatment, contract violations, or any other legitimate or illegitimate basis. A rational jury may well discard this proffered reason as unworthy of credence, it is so irresponsible as to lack credibility.

d. Colon has admitted that he knew nothing whatever about plaintiff's outstanding past performance at HPHS, as both teacher and Faculty Manager. Colon Tr. 57. He admits he knew nothing about Physical Education, generally, so he simply took Ms. Bernabucci's recommendations. *Id.* 176-78. Before Ms. Bernabucci made the recommendation that David Hodge should become Faculty Manager, Colon had already communicated his intent to have Ms. LaPenna transferred back to HPHS. *Id.* 182. Therefore it is difficult to believe that HPS had to remove Ms. LaPenna from her Faculty Manager position due to her transfer to Webster School.

e. Neither Mr. Wall, who was Principal of Hartford High for several years before July 1, 2000; nor former Superintendent Amato; nor Robert Henry, who was Chief of Staff under Mr. Amato responsible for Human Resources, and is currently Superintendent of HPS; nor Frank Dumont, who was Director of Labor Relations; nor Robert Stacy, who was Director of Human Resources; nor June Bernabucci, who was Athletic Director; nor Dr. Colon could make any rational connection between transferring Janice LaPenna out of HPHS and obtaining accreditation or improving HPHS. Their testimony essentially describes leaving the matter to the arbitrary and capricious whim of an inexperienced principal. Wall Tr. pp. 42-45; Amato Tr. pp. 28-30; Henry Tr. pp. 13-14, 18-19, 34, 36, 40-41, 60-61; Dumont Tr. pp. 66-68; Stacy Tr. pp. 4-5, 48-55; Bernabucci Tr. pp. 124-5; Colon Tr. p. 72.

f. According to Frank Dumont, the former Director of Labor Relations, HPS

administration would not have transferred a large group of teachers like this without very substantial reason, because of the enormous amount of resources involved. Dumont Tr. pp. 53-56. Colon could not possibly have acted independently to transfer plaintiff or any other teacher out of his school. Dumont said no principal of a school could have made an independent decision to transfer teachers out of a school. He could request the action, but the order would have to come from the highest levels of upper management. *Id.* On the other hand, Dumont was the source of the August 3, 2000 letter which proffered numerous false reasons why it was necessary to transfer Ms. LaPenna, according to Robert Stacy. And Dumont was also the author of the March 26, 2001 memorandum which purported to memorialize a "Superintendent-level hearing" on plaintiff's grievance, which hearing, according to Bernabucci, one of the named participants who appeared for HPS, never took place. Bernaucci I Tr. 59-63.

g. Janice LaPenna had done an outstanding job for Hartford High, both as a Physical Education teacher and as its Faculty Manager. Holloway Affid. ¶¶3-14 and Exhibits A through D. She had taught in the Hartford Public Schools for twenty five years, had coached for fourteen, and had been the Faculty Manager for four years already. Bernabucci I Tr. p. 13, 124. She was a graduate of Hartford High herself. *Id.* She had given so much of her time and was so dedicated to Hartford High, that she had frequently missed her own daughter's athletic and school events in order to be at Hartford High. Holloway Affid. ¶¶10, 11, 13, 14; LaPenna Affid. ¶5.

h. Defendants have asserted a series of contradictory facts through Colon, concerning why he allegedly decided to transfer Janice LaPenna. The shifting reasons provided by Colon, in

and of themselves, provide sufficient support for a finding that the defendants' proffered reasons are unworthy of credence and they are concealing an illegal reason.  <u>First</u>, during the summer of 2000 Dr. Colon asserted that he was not the decision maker, as set forth above.  <u>Second</u>, at the CHRO investigative conference during 2001, he claimed that Joseph Wall had placed plaintiff's name on a list of teachers he recommended be transferred out.  Then defendants claimed, in their Rule 26(a) disclosures, that they could not provide an address for Mr. Wall.  <u>Third</u>, in their Interrogatory Responses, Colon attested, in response to a question why plaintiff was selected for transfer, that he took the advice of Joseph Wall "and other administrators," to identify poorer educators and those who were not "team players."  Colon Tr. pp. 6-8 and Exhibit 7 thereto, at pp. 9-10.  <u>Fourth</u>, after defendants learned that plaintiff had located Mr. Wall and served him with a subpoena, Colon came up with a new story:  he no longer asserted that Wall had made any recommendation to transfer Ms. LaPenna (as indeed Mr. Wall testified he did not and would not have).  Rather, he asserted that either Mr. Wall or former Executive Vice Principal Harry Holloway had said, in an administrative meeting at which they were both present with Colon, that Janice LaPenna was "not a team player."  Colon Tr. pp. 25, 29-35.  Interestingly, both Wall and Holloway are retired, and presumably have no interest in this case.  Both of them have sworn that they never said, and never heard anyone else suggest, that Janice LaPenna is not a team player.  Mr. Holloway lives in another state and was difficult for plaintiff to locate, but his Affidavit is attached.  His response to the suggestion that she is not a "team player," or that he ever would have said such a thing, is that she is a team <u>leader</u>, and he would have corrected anyone who suggested such a thing.  Holloway Affid. ¶¶15; Wall Tr. pp. 41-45.

i.  Stacy instructed Frank Dumont to write the letter that was sent to Ms. LaPenna to notify her of the transfer.  Although that letter provided the first proffered reasons for the transfer, its author testified he did not actually know why Ms. LaPenna was transferred, he just did what he was told to do and must have written what someone, although he knows not who, told him.  Dumont Tr. 45-48, 63-68.  If defendants actually had a valid reason for the transfer, or if they believed there was any truth in the statements in the transfer letter, they would have provided information, in response to discovery requests on point, about the source of the information.  Instead, each of their witnesses was unable to verify any of the statements in the letter.  This further supports a finding of mendacity and concealment of the true reasons.

j.  In summary, there is abundant reason to disbelieve the defendants' proffered reasons. This is of enormous importance, given that Colon testified that other than this highly subjective "team player" proffer, there was no justification to transfer LaPenna or remove her from her position as Faculty Manager.  Colon Tr. 72.

**3.  Was the Transfer an adverse action?**

It is amazing that the defendants have made this argument, given plaintiff's loss of approximately $10,000.00 per year in income and a school-wide athletic position, as a result of the actions at issue.

a.  Robert Stacy, then HPS's Director of Human Resources, a lawyer with certification as a Senior Professional in Human Resources, testified that the involuntary transfer of plaintiff's teaching position was an adverse action.  Stacy Tr. pp. 4-5, 38.  His signature was on the letter notifying Ms. LaPenna that she was to be transferred out of HPHS, although he claimed not to

have written it; he said Director of Labor Relations Frank Dumont wrote the letter, but <u>because it was an adverse action</u>, Stacy did not authorize any of his staff to sign it, including Dumont, but authorized only his own electronic signature. *Id.* pp. 36-42.

b. According to defendants, when they transferred Ms. LaPenna out of HPHS, the transfer made it necessary to remove her from the position of Faculty Manager, an extracurricular position in which this teacher and mother earned approximately $10,000.00 per year in addition to her teacher's salary. Bernabucci I Tr. pp. 24-26, 72; Stacy Tr. p. 92 ($9,760.00 for the 2000-2001 school year, $10,149 for the following school year, higher thereafter). So the transfer took away the employment opportunity to continue as Faculty Manager (or was used as the excuse to take away the opportunity).

c. Colon was aware that the Faculty Manager position was a paid extracurricular position. Colon Tr. p. 78.

d. According to Ms. Bernabucci, in July, 2000, she informed Colon that if Ms. LaPenna were transferred out of HPHS as a teacher, HPHS would lose its Faculty Manager as well. Bernabucci I Tr. pp. 129-32. Bernabucci was also aware that the Faculty Manager position paid approximately $10,000.00 per year. Bernabucci I Tr. 72.

**4. Did Ms. LaPenna have a contractual right that was violated by the transfer?**

a. According to the lawyer who negotiated and signed the Union Contract in behalf of HPS, Director of Human Resources Robert Stacy, transferring Ms. LaPenna was an involuntary transfer; and the Union Contract provides that HPS cannot involuntarily transfer an HPS teacher without first providing a conference with the Superintendent or his designee, which would be the

Human Resources Department.  Stacy Tr. 4-5, 68-76.  Moreover, HPS was required to transfer the least senior teacher in a department at the school first.  *Id.*

b.  Ms. LaPenna had more seniority than at least one other HPHS Physical Education teacher who was retained, and both who were transferred in. LaPenna Affid. ¶24; Stacy Tr. 74-6.

c.  Nobody from the Human Resources Department or the HPS central offices ever contacted Ms. LaPenna or held a conference with her regarding the transfer, through the start of the new school year.

**5.  Did Ms. LaPenna have a contractual right to the job of Faculty Manager?**

a.  The terms of the Faculty Manager position, as well as other extracurricular athletic positions, are set forth in the collective bargaining agreement for HPS teachers ("Union Contract").  According to HPS Director of Human Resources Robert Stacy, who negotiated the Union Contract and signed it in behalf of HPS, the Faculty Manager position was a two-year assignment.  Ms. LaPenna's contractual term had started in July, 1999.  In the summer of 2000, they were in the middle of her two-year contractual term, and Ms. LaPenna could lawfully be removed only for just cause:  to remove her without just cause would violate her contractual rights.  Stacy Tr. pp. 83-87;  Dumont Tr. 107-08.

b.  According to June Bernabucci, also, Ms. LaPenna was in the midst of a two-year contract as Faculty Manager when HPS removed her from the position.  Ms. Bernabucci said HPS had "taken the position" that if Ms. LaPenna were not at the school she could not be Faculty Manager, but she conceded that this is not stated in the Union Contract or anywhere else, and it had never come up before.  Bernabucci II Tr. 57-63.

**6.  Could Ms. LaPenna have continued to perform the job of Faculty Manager at Hartford High despite the transfer to an elementary school?**

a.  Defendants assert that Ms. LaPenna lost her extracurricular job as Faculty Manager upon her transfer to Webster School, as a mere inadvertent side effect of the transfer of her teaching assignment.  Defense Mem. p. 2.  Ms. Bernabucci insisted it is a requirement of the job of Faculty Manager that the person must be appointed to teach at the same school and be available there all day, particularly immediately after school.  Bernabucci I Tr. 24-38, 57-63.  Her arguments collapsed precipitously under cross examination.  Essentially, she asserted this was so that the Faculty Manager could communicate with coaches, other schools, bus companies and her office, most or all of which is done by telephone. Many of the coaches are not teaching in the same building during the day, anyway.  Bernabucci I Tr. pp. 24-38. Neither the written job description for Faculty Manager, the posting for the job as Faculty Manager, nor the Union Contract, each of which indicates qualifications for the job and describes the duties, gives even a hint that the Faculty Manager must be assigned to teach at the same school or be present at the school immediately afterwards.  *Id.* 82-3, 94-103 and Exhibits 6 and 7 thereto.  In fact, the job posting explains that a person who is not an employee of HPS in any other capacity whatever can apply for the job, but must have three references.  *Id.* 94.

b.  The Faculty Manager at Weaver High School, Matt Steele, is a teacher who spends only the first two periods of the school day at Weaver High School;  he then leaves for his job as a teacher at another school, and he does not return to Weaver High School until approximately 2:30 to 3:00 p.m.  Louis LaPenna Affid. ¶29.  This does not create a problem for the athletic

programs, because the Faculty Manager is not actually involved with the programs on a day-to-day basis immediately after school; the Faculty Manager is directly involved with the teams only when there are games where money is collected, which occurs in the very late afternoons, evenings and weekends. *Id.* ¶30. It does highlight just how disingenuous it is of defendants, to assert that yanking plaintiff out of her $10,000.00 per year position as Faculty Manager was a mere inadvertent and unavoidable consequence of her transfer. According to the defendants' actions and statements, a man can be Faculty Manager without being present at the school all day, or immediately after school, but a woman cannot.

    c. Former HPHS Executive Vice Principal Harry Holloway, who directly supervised the Faculty Manager at HPHS for many years, agrees that the job consists mostly of paperwork and telephone calls, which require neither presence in the building during the school day nor presence in the building immediately at the end of the academic day. Holloway Affid. ¶¶ 16-17.

    d. Just as Matt Steele can perform the job of Faculty Manager at Weaver High School today, Janice LaPenna could have performed the duties of Faculty Manager for HPHS quite well, even while she was assigned to Webster Elementary School as a teacher. LaPenna Affid. ¶¶4-9. Steele is at Weaver for the first two periods of the day, but is assigned to teach; Louis LaPenna Affid. ¶29; LaPenna could have been at HPHS for the first part of the day, and would have had no teaching duties to complete during that time, which would have placed her in a better position to complete all of the job duties efficiently. LaPenna Affid. ¶¶7-8. Steele is not at Weaver until half an hour to an hour after the end of the school day; plaintiff could have been at HPHS approximately an hour after the end of the school day. Nonetheless, HPS took the completely

insupportable and sexist position that once Ms. LaPenna was teaching in another school, by contrast to Matt Steele, she necessarily lost her job as Faculty Manager.  Stacy Tr. pp. 83-87.

e.  At his deposition, Robert Stacy testified the job description for Faculty Manager was the source of the decision that one must be in the school all day to perform the job;  but when he was shown the job description and the job posting for the position, he conceded there is no such requirement written there or anywhere else.  Stacy Tr. 22-23, 104-111.

**7.  Who made the decision to remove Janice LaPenna from the extracurricular job of Faculty Manager at Hartford High upon her transfer, and why?**

The more clearly adverse action in this case was removal of Ms. LaPenna from the position of Faculty Manager.  The transfer was an adverse action in that HPS used it to take away plaintiff's extracurricular job opportunity.  Once we eliminate the defendants' insupportable claim that she could not be Faculty Manager after the transfer, and accept that she could have fulfilled the job, just as Matt Steele can do it for Weaver High School while teaching at another school, we must ask who made the decision to remove her from that job, and why.

a.  Dr. Colon told Ms. LaPenna, on the first day of school, that he believed she was still the Faculty Manager, and he would have no problem with her continuing in the position while she taught at Webster School.  Gunn Affid. ¶11;  Turcotte Affid. ¶¶14-15;  LaPenna Affid. ¶¶34-36.  This was stated in the underlying CHRO Complaint in this case.  Meyer Affid. ¶7; Stacy Tr. 8 and Exh. 1.  In its Answer to the part of the CHRO Complaint which alleges this fact, HPS did not deny its truth; but it asserted that Dr. Colon's view on the subject was irrelevant, as he did not have discretion to permit her to perform the HPHS Faculty Manager job while teaching at

Webster School.

   b.  Bernabucci testified it was Frank Dumont who made the final decision that LaPenna could not be Faculty Manager while teaching at Webster.  Bernabucci I Tr. 55-56.  Reviewing the HPS Answer to the CHRO Complaint, in which HPS expressly stated that Principal Colon's opinion is not relevant, she said that if Colon had indicated he was comfortable with having Ms. LaPenna as Faculty Manager even after the transfer, Ms. LaPenna could have done the job.  *Id.* pp. 55-57.  But Frank Dumont testified that he neither made this decision nor did he advise anyone it was necessary.  Dumont Tr. 81-83.  There is nothing in the Union Contract that requires the Faculty Manager to be assigned to the same school.  *Id.* 120.  So far as he was concerned also, Ms. LaPenna could have done the job, although "someone told him" she could not -- either Colon or Bernabucci.  *Id.* 124-25.  That defies not only Bernabucci's testimony, but also that of Robert Stacy, who claimed he had consulted with Frank Dumont as to whether the transfer constituted just cause to discharge plaintiff from her Faculty Manager position.  Stacy Tr. 86.

   c.  Several HPS witnesses claim there was a telephone conference with Webster School Principal Freeman Burr, at which Mr. Burr was asked whether he would release Ms. LaPenna early, so that she could remain in her position as Faculty Manager.  Freeman Burr testified at the CHRO investigative conference in this case.  He testified that nobody other than Janice LaPenna had ever discussed with him anything related to her performing the HPHS Faculty Manager job while teaching at his school.  LaPenna Affid. ¶41.  He indicated to Ms. LaPenna that he had no problem with her doing the job, so long as she fulfilled her teaching duties at Webster.  *Id.*

d.   Dr. Colon has testified that he selected Mr. Hodge as Faculty Manager upon Bernabucci's recommendation, as set forth above.  He does not know what a Faculty Manager does, whether the job duties can be performed in the early morning, or whether the job can be performed well by someone who is assigned to teach at an elementary school, so he had no reason to remove Ms. LaPenna from that position.  Colon Tr. 157-58.  (Indeed, he claimed nobody ever discussed with him the possibility of Ms. LaPenna performing the job while teaching at Webster, in defiance of the testimony of Gunn, LaPenna and Turcotte.  *Id.*) Colon refused Bernabucci's demand that he put "his" choices in writing, because he had merely taken her recommendations and had expected her to inform the Human Resources Department of them. Colon Tr. 174-78.

e.   When June Bernabucci recommended that David Hodge be appointed as Faculty Manager, rather than Janice LaPenna, Dr. Colon had already communicated his intent to have Ms. LaPenna transferred back to Hartford High.  Colon Tr. 182-83.  Before school started, Colon had received permission from Mr. Amato and had already done the necessary paperwork to transfer Ms. LaPenna back to Hartford High.  He had told Ms. Bernabucci that.  *Id.*

**8.  Who decided that Ms. LaPenna could not resume her contractual position as Faculty Manager upon her transfer back to Hartford High, and why?**

Even more suspicious than the action of removing Ms. LaPenna from her extracurricular position is the decision not to permit her to resume the job upon her transfer back to Hartford High.  If, as defendants now assert, her removal from the position was a mere inadvertent side effect of the involuntary transfer, then why was she prevented from returning to the position?

a. Colon first suggested to Ms. LaPenna that she might be able to continue teaching at Hartford High if she would relinquish the position of Faculty Manager, at the August 14 meeting with her, as set forth above. He had not met Mr. Hodge, and had no idea what the position of Faculty Manager entailed, and he proclaims even now that he merely took Ms. Bernabucci's recommendation to appoint Mr. Hodge to the position, which recommendation was made after he communicated his intent to have Ms. LaPenna transferred back to Hartford High.

b. In September, Dr. Colon contacted plaintiff to ask whether she would agree to return as a teacher but not as a Faculty Manager. In other words, in order to have one violation of her contractual rights corrected she was asked to relinquish any right to have the other violation corrected. She was attempting to utilize her union grievance proceedings, and therefore deferred to her union representatives, appropriately, each time. LaPenna Affid. ¶43.

c. When HFT Vice President told her to report to Hartford High on Monday morning, September 25, she was sent to the HPS central offices, to the Human Resources Department. As she arrived, David Hodge was leaving. Frank Dumont told plaintiff that David Hodge was doing her a favor and agreeing to teach math, rather than Physical Education, so that she could return to Hartford High. He also told her she would not be Faculty Manager, and he warned her that she "had better not make any trouble." LaPenna Affid. ¶43. Other than her efforts regarding the SSA matter and her efforts to have her transfer and removal as Faculty Manager corrected, Ms. LaPenna had never known anyone to suggest she had "made any trouble."

9. **Did Mr. Amato, Dr. Colon, Ms. Bernabucci and/or HPS know, or have reason to know,**

**they were violating Ms. LaPenna's contractual rights?**

a.  When the Union President and Vice President met with Mr. Amato and Mr. Stacy for the first time to discuss the transfers, Mr. Vargas pointed out that the transfers violated the Union Contract.  Neither Mr. Amato nor Mr. Stacy denied this.  Rather, Mr. Amato was defiant and told them "You have to do what you have to do."  Vargas Affid. ¶¶4, 5;  Hagan Affid. ¶¶14-16.

b.  As to the involuntary transfers of the group of teachers, Mr. Amato testified that the issue whether it violated the union contract was raised, but "we could not conclude one way or the other."  Amato Tr. 33.  So at the time the transfers were made, they acted with knowledge that they might be violating the contract.

c.  As to removal from the Faculty Manager position, Mr. Dumont and Mr. Stacy testified that it would violate the contract to remove plaintiff from her position at the time without just cause.  Dumont Tr. 107-08; Stacy Tr. 83-84.

d.  As to the involuntary transfer, Mr. Stacy admitted that the Union Contract required that Ms. LaPenna be given a meeting with the Superintendent or his designee, the Human Resources Department, prior to the transfer.  This was not done, nor did the transfer letter invite Ms. LaPenna to request such a meeting.  Stacy Tr. 68-76, 83-84; LaPenna Affid. ¶24.

**10.  Was June Bernabucci a supervisor of Janice LaPenna, for purposes of this case?**

Defendants have asserted that Bernabucci was not a supervisor to plaintiff.  While most of the direct supervision of teachers lies with the principal of the school, Ms. Bernabucci also had supervisory authority over Physical Education teachers and over all coaches and faculty

managers.  As set forth above, Bernabucci influenced or affected the terms and conditions of plaintiff's employment.  There is additional evidence that Bernabucci was plaintiff's supervisor.

a.  Robert Stacy, the Human Resources Director for HPS, testified that the Faculty Manager reports to both the Principal and the Director of Athletics, which was Ms. Bernabucci's position at the pertinent time.  Stacy Tr. p. 98.

b.  June Bernabucci performed Ms. LaPenna's annual performance evaluation in 1996.  LaPenna Affid. ¶45.


**11.  <u>Is there evidence from which a rational fact finder could infer that the adverse decisions at issue were motivated, at least in part, by plaintiff's gender?</u>**

a.  Plaintiff was replaced by a young male, David Hodge, in both her teaching position and her position as Faculty Manager, as set forth above.  She was performing well, but was pulled from the positions and replaced by a man.  That constitutes a *prima facie* case.

b.  Defendants' claims about who made the decision and about the reason for the decision have shifted over the course of time, as further set forth above.  For example, in the summer of 2000, in the transfer letter, they asserted this was necessary for the Hartford School Improvement Plan, and related to obtaining NEASC accreditation.  Then Colon stated plaintiff had made an enemy downtown when her mouth got her into trouble.  He told the Union it was Bernabucci's decision, yet Bernabucci insisted it was his decision.  At the CHRO, in 2001, defendants asserted that Colon transferred plaintiff on the recommendation of Joseph Wall, who, they claimed, had prepared a list of teachers to be transferred.  LaPenna Affid. ¶33.  In the interrogatory responses,

he backpedaled from that position and asserted that Wall had suggested plaintiff's performance was wanting, but he (Colon) had made the decision to transfer her. He revised his interrogatory responses near the time of his deposition to state Wall had suggested plaintiff was not a "team player." Then he revised even that statement during his deposition, knowing plaintiff had subpoenaed Wall to a deposition, and asserted that either Wall or Holloway had said, at some meeting they all attended, that LaPenna was not a "team player." That is untrue, according to both Wall and Holloway. All of this permits an inference that the defendants have proffered false reasons to conceal discrimination. Coupled with the *prima facie* case, it is sufficient to prove gender discrimination.

c. Both in 2000 and in defending this case, defendants have repeatedly asserted the NEASC accreditation problems as a reason why plaintiff was transferred. Ms. LaPenna has read the NEASC reports on Hartford High, and not one word is in them about a need to improve Physical Education teaching or the athletic programs at Hartford High. LaPenna Affid. ¶29. It is one more false reason, this one asserted at the time of the transfer.

d. As set forth above, HPS apparently believes a man can perform the job of faculty manager at a high school, even though he is assigned to teach at another school for most of the day and cannot be at the high school immediately at the end of the school day, but a woman cannot. Plaintiff was treated adversely, relative to a similarly situated male employee.

e. Although defendants have attempted to assert it was not David Hodge who replaced plaintiff, Frank Dumont told her she could return to Hartford High because David Hodge had agreed to "do her a favor" and teach math, to make a place available to her in the Physical

Education Department.  LaPenna Affid. ¶43.

**12.  Is there evidence from which a rational fact finder could infer that the adverse decisions at issue were motivated, at least in part, by plaintiff's age?**

a.  Janice LaPenna was forty-nine years of age on the effective date of the transfer in August, 2000.  Meyer Affid. ¶6. David Hodge was born in 1966, so on the effective date of the transfer he was thirty-four or thirty-five years of age.  Meyer Affid. ¶5.

b.  Plaintiff performed her job well, yet she was removed and replaced by a much younger employee, in both her teaching position and her position as Faculty Manager, as set forth above.

c. Although defendants have attempted to assert it was not Hodge who replaced plaintiff, Frank Dumont told her she could return to Hartford High because Hodge had agreed to "do her a favor" and teach math, to make a place available to her in the Physical Education Department. LaPenna Affid. ¶43.

d.  Colon said he wanted to bring "new blood" to Hartford High.  Defense Mem. p. 15; Colon Tr. 44-45.  Since defendants assert Colon was a decision maker, or the decision maker, and since he made the comment while testifying at the CHRO, in the context of explaining the decision to transfer an older teacher out and replace her with a younger teacher, his comment cannot be assumed to be a "stray remark." NEASC wanted new methodologies;  it was not the NEASC representatives, but Colon, who felt he needed "individuals who come with new methodologies, new ideas." *Id.*  A jury could infer ageism from this remark, taken with the other

facts in the case.

**13.  Is there evidence from which a rational fact finder could infer that the adverse decisions at issue were motivated, at least in part, by retaliatory animus because of plaintiff's protected speech?**

Defendants have asserted there is no evidence from which a jury could rationally find that plaintiff was discharged because of protected speech.  Indeed, they deny plaintiff even engaged in any protected speech, as she did not sign the Petition of October 8, 1999 and she cannot recall the specifics of her discussions with Bernabucci.  The following evidence would support a finding that Bernabucci and Amato both sought to silence the teachers and coaches from protesting the requirement to include SSA varsity teams in the City Series events, and that Bernabucci was angry at both plaintiff and her husband for what she perceived as their opposition to her plan.

a.  SSA opened in the fall of 1996.  Bernabucci Tr. I 170.  Bernabucci described herself as the founder of the SSA, correcting herself to proclaim she is only "one of its founders." Bernabucci I Tr. 180.  She is on the Board of Directors of SSA. *Id.* p. 176.  At one time, she had very strong feelings about scheduling athletic contests between SSA and the three local public high schools of HPS.  *Id.* pp. 157-58.  She described SSA as "like a small child growing up," and explained that her feelings are not as strong now as they were when she spoke with Mr. Amato about this in 1999, because "[t]hey're on their own."  *Id.* But this issue predates her discussion with Mr. Amato.

b.  When SSA was created as a charter school in Hartford, the HPS coaches were told it

would not have its own varsity athletic teams, but rather the students would return to their home schools to participate in extracurricular athletics.  Louis LaPenna Affid. ¶6.

c.  In spring, 1998, the HPS coaches and faculty managers were notified that SSA was going to have its own varsity teams the following year, and the local schools would be required to schedule games with SSA as part of the City Series interscholastic games ("City Series") for the following year.  Louis LaPenna Affid. ¶7.  The requirement was based upon Bernabucci's recommendation.  Bernabucci Tr. I, 166-67.  Paul Stringer, the Principal at Bulkeley High School (and later of Weaver High School), the faculty managers of all three HPS local high schools, and many of the coaches objected to the requirement that they schedule games against SSA, for a variety of reasons.  Louis LaPenna Affid. ¶¶8-10.  Bernabucci insisted that the other high schools schedule games with the new SSA teams.  Louis LaPenna Affid. ¶11 and Exhibit A thereto.  Superintendent Dr. Benjamin Dixon held a meeting with Principal Stringer and the faculty managers, to discuss their concerns.  LaPenna Affid. ¶¶14-16;  Bernabucci I Tr. 157-76.  Plaintiff Janice LaPenna had had discussions with Bernabucci about the issues;  and she was opposed to underlining requiring coaches to include SSA in their schedules.  LaPenna Affid. ¶15.  Ms. Bernabucci has trouble even admitting that the meeting with Dr. Dixon took place, or that there was ever any legitimate controversy.  Bernabucci I Tr. 157-67.

d.  The coaches and faculty managers who objected had various reasons for their opposition.  The students' schedules allowed for only a fixed number of games in each season, and if a team had to add a game with SSA, they must forego another game, possibly eliminating a traditional rivalry such as the 100-year-old game between HPHS and New Britain General

High School.  Football coaches were concerned that playing against SSA could knock them out of the State playoffs, because they would not earn points for a game against SSA.  Louis LaPenna, who coached the Boys' Basketball Team at Weaver High School had developed special games each year that had the whole community excited, such as a game against a team from Brooklyn and one against a New Haven school outside of their Central Connecticut Conference.  His team had played before audiences of thousands, and they and their families and friends took enormous pride in these games.  Scheduling a game against SSA was not, in Mr. LaPenna's opinion, in the interest of his young athletes.  Janice LaPenna echoed her husband's concerns.  She also recalled that as a child growing up in Hartford, she could remember the parade on Franklyn Avenue before the game against New Britain, and she knew that this traditional, 100-year-old rivalry was a valuable tradition of the school community.  It fostered school spirit and bonding, which keeps children in school.  The HPHS football team had to eliminate its game against New Britain to schedule even one game with SSA.  Louis LaPenna Affid. ¶¶7-10, 14, 18;  LaPenna Affid. ¶¶14.

    e.  The requirement to include SSA in the City Series was not enforced for the 1998-99 school year or the 1999-2000 school year.  Louis LaPenna Affid. ¶12, 7;  LaPenna Affid. ¶16.

    f.  Shortly after Anthony Amato became Superintendent, June Bernabucci had a meeting with him at which she recommended that the local high schools be required to schedule games with SSA as part of the City Series.  Bernabucci I Tr. 183-187.  She told him there had been a controversy about this in the past, that a letter had been written to the Mayor of Hartford about this, and she described some of the arguments that had been raised.  *Id.*

g.  June Bernabucci claimed she did not recall whether Mr. Amato issued a memorandum directing the other high schools to include SSA in the City Series.  *Id.*, 187.  Yet it was June Bernabucci who wrote this September 15, 1999 memorandum (the "Directive").  Bernabucci II Tr. 5-6 and Exhibit 14.  It was June Bernabucci who sought to have SSA added to the athletic competition schedules of the other schools, once again, and it was she who wrote the Directive and convinced Amato to sign and issue it.  She was aware that a former superintendent had been persuaded by her opponents, and it had taken her another year with a new superintendent to implement her plan behind the scenes again, letting the coaches know only after she had convinced Mr. Amato to sign her directive.[3]

h.  When they received the September 15, 1999 memorandum, several of the coaches expressed a great deal of distress about the impact it would have on their programs, once again.  LaPenna Affid. ¶¶11-12.  Janice LaPenna, as Faculty Manager at HPHS, felt that the coaches should discuss the matter directly with the Superintendent.  She wanted him to understand their concerns, as the teachers who deal directly with the students, and must motivate them and make them feel proud of what they can do, who hear what the students say about their athletic

---

[3]

Plaintiff is not asserting that this is some sort of evil scheme.  The point is not whether Ms. Bernabucci was correct in planning and implementing this change in the athletic programs, or whether Mr. Amato was correct to sign her directive and decline to meet with the coaches.  The point is only that Ms. Bernabucci had a plan that had been hindered when a former superintendent allowed the teachers, administrators and coaches to discuss their concerns for their students' programs, and that Ms. Bernabucci was clearly angry to have them attempt again to discuss the matter with the current superintendent.  The fundamental material issue is whether plaintiff, when she objected to the requirement to schedule SSA, and when she prepared and submitted the Petition and asked Mr. Amato to contact her to set up a meeting, was engaging in protected speech.

programs on a daily basis.  *Id.* ¶17.  She knew that a former superintendent had been persuaded not to make this a requirement, and hoped this new superintendent would discuss the issues with them openly.  *Id.*  Whether he agreed with them or not, if they could present the issues to him they would have done their best for their students.  *Id.* ¶19.

     i.  Janice LaPenna prepared the document attached to her Affidavit as Exhibit A, dated October 8, 1999 (the "Petition"), for the coaches to sign, requesting a meeting with him to discuss these issues.  She did not sign it herself, as she was not a coach; but she included her own name and telephone number as the person for Mr. Amato's office to contact, to schedule the requested meeting.  LaPenna Affid. ¶¶17-18 and Exhibit A.

     j.  Mr. Amato did not contact Ms. LaPenna to arrange a meeting.  *Id.* ¶20.  He did, however, ascertain that the signers of the Petition were not supportive of his decision.  Amato Tr. 57.  According to Ms. Bernabucci, she received the Petition with a note from Mr. Amato, directing her to see him.  Bernabucci II Tr. 8-9.  To Bernabucci, these were familiar issues.  She suggested to Mr. Amato that she would meet with the coaches.  *Id.* pp. 15-17.

     k.  Bernabucci's "meeting with the coaches" consisted of ordering each person who had signed the Petition to come to her office, where she questioned them and tape recorded their responses as well as making notes.  Bernabucci II Tr. 15-17.  She does not recall what questions she asked or anything more about the interviews.   Although she made notes and tape recordings, she says she turned them all over to Mr. Amato, and they cannot be located now.  *Id.*

     l.  Louis LaPenna, plaintiff's husband, is also a Physical Education teacher and coach for HPS, at Weaver High School.  Louis LaPenna Affid. ¶¶3-5.  With other Weaver High School

coaches, he also signed a petition in response to the September 15, 1999 directive, asking for a meeting with Superintendent Amato.  He wanted to discuss his concerns about the negative impact he believed it would have on his boys' basketball team and its members.  *Id.* ¶¶14, 15. Within a few weeks after he signed the Petition, he was summoned to Bernabucci's office, as were other coaches from Weaver High School, one by one, and he was questioned by her.  *Id.* ¶¶16.  She made written notes and tape recorded the interview.  *Id.* ¶17.  He recalls that the entire interview was disturbing and intimidating, and Bernabucci's hostility to his point of view was clear.  *Id.* ¶19.  She did not ask why he felt his team should not be required to play SSA, but she did demand to know whether he believed all "kids" deserve an equal chance.  *Id.* ¶18.  He recalls telling her he believed that each team and coach should be allowed to choose whether to include SSA in its game schedule, according to the needs of their teams and their programs.  *Id.*

m.  A few weeks after this interview, Mr. LaPenna was asked by a colleague from a different school system to provide a copy of the September 15, 1999 memorandum, and he faxed it from Weaver High School, unaware of any reason not to do so.  *Id.* ¶20.  He did not fax or send it to Mil Mason, President of the Central Connecticut Council, the athletic league in which his school's teams compete, although he does not know of any reason that would be prohibited, either.  *Id.* ¶21.

June Bernabucci sent him a written warning, threatening him with potential discharge from his employment for allegedly faxing the memorandum to Mil Mason (which he had not done), accusing him of attempting to "subvert opportunities for Sport Sciences Academy students," and suggesting he had been insubordinate.  *Id.* ¶21 and Exh. B thereto.  Mr. LaPenna

grieved this extraordinary action, and had a meeting with his union representative and Bernabucci. *Id.* ¶22, 24-26. At that meeting, June Bernabucci was aggressively hostile and angry; she again threatened Mr. LaPenna's job. *Id.* When he protested that he had not been insubordinate, she raised her voice and warned him that she had him on tape admitting he was opposed to the requirement that Weaver's teams include SSA's teams in their schedules – a position he had never denied. *Id.*

Bill Hagan was Mr. LaPenna's union representative at the time, and he attended the meeting. Hagan Affid. ¶¶3-8. As he recalls this meeting, Ms. Bernabucci appeared to be very angry at Mr. LaPenna; her response appeared to him to be harsher and angrier than would have been reaonsable. *Id.* ¶¶9-10. Nonetheless, when Mr. Hagan got Ms. Bernabucci to reduce the penalty from a written warning to a "verbal" warning, Mr. LaPenna agreed not to fight it further. *Id.* ¶11-12; Louis LaPenna Affid. ¶27-28. In light of his family obligations and the extreme and irrational anger Bernabucci had expressed, he decided not to pursue the matter. *Id.*

n. Bernabucci also wrote to all of the coaches and faculty managers, telling them that their petitions and a memorandum from Principal Stringer had no effect on Mr. Amato's "directive," as she called it, and they were to schedule SSA into their 2000-2001 City Series competitions. Louis LaPenna Affid. ¶23 and Exh. C thereto. She added that they were not authorized to "act to undermine Superintendent Anthony S. Amato's initiatives," which is an act of insubordination; and that they were not to utilize public property "to communicate views" that were not the official position of HPS. (Ironically, this veiled threat clearly referred to the faxing of the September 15, 1999 directive – and it would be hard to find a better example of

communicating only the official position of HPS!)

o.  In the spring of 2000, HPS Chief of Staff Robert Henry met with Weaver High School

Principal Paul Stringer and several coaches from the school, including Louis LaPenna, as well as

the Vice Principal of SSA, Les Correa, and its football coach, David Hodge, to further discuss

the directive.  Louis LaPenna Affid. ¶31.  June Bernabucci was present, next to Mr. Henry, and

appeared annoyed.  *Id.*  At that meeting, SSA football coach David Hodge presented Ms.

Bernabucci's position, in favor of requiring the other schools to schedule games with SSA.  *Id.*

Weaver High School football coach Tim Sullivan presented the opposing arguments.  *Id.*  After

this meeting, Mr. Henry ruled in favor of Weaver High School:  although they had been required

to schedule SSA for the 2000-2001 school year competitions, per the September 15, 1999

directive (games must be scheduled at the end of each sports season for one year into the future),

they were not required to schedule such games thereafter.  *Id.* ¶¶33, 7.

p.  It was July, 2000, only a few months after Mr. Henry's decision adverse to Ms.

Bernabucci's initiative, about which Bernabucci felt very strongly at the time, that Janice

LaPenna was removed as Faculty Manager of HPHS and transferred out of HPHS as a teacher.

She was replaced by David Hodge, who had "perceived problems" with the SSA administration,

and who had argued in favor of Bernabucci's position.  Ms. Bernabucci had been "cold-

shouldering" Ms. LaPenna ever since the time of the Petition;  LaPenna Affid. ¶22;  she had

threatened Louis LaPenna with potential discharge for alleged insubordination, and had

expressed irrational anger at him, for opposing her initiative;  Louis LaPenna Affid. ¶¶21, 26;

Hagan Affid. ¶¶9-10;  and she was aware that Louis and Janice LaPenna were a husband and

wife with a daughter to support.  Bernabucci II Tr. 124.

  q.  Colon has admitted he knew nothing about Janice LaPenna or her teaching, nothing about Physical Education, nothing about the job of Faculty Manager, and had no reason to believe she had ever been uncooperative in any NEASC accreditation effort, or that he needed to change any Physical Education staff for the sake of the accreditation effort.  Colon Tr. 57, 107-10, 143, 157-59.  In fact, according to Colon, as soon as he met her he told the administration he needed her back – well before any transfer actually took place.[4]  *Id.* 81, 110.

  r.  Bernabucci knew that LaPenna cared deeply about her job at HPHS, that she was a graduate of the school and had worked very hard for the school.  So she knew the transfer would be hurtful.  Bernabucci I Tr. 124-25.

## 14. Why Did Plaintiff Perform Poorly in the June, 2001 Interview for the Faculty Manager Position?

  Defendants capitalize on the fact that plaintiff, in an honest self-assessment, admitted the fact that when she was interviewed for the position of Faculty Manager in June, 2001, her performance, in retrospect, was "lousy."  Defense Mem. pp. , 8, 13.  Defendants have neglected to include plaintiff's deposition testimony about the hopelessness and helplessness she felt;  that her union had advised her that even if she came into that interview with a PowerPoint

---

[4]

According to Human Resources Director Robert Stacy, a transfer is not effective until the first day of school.  So long before the transfers were effective, if any of their testimony is to be believed,  Colon had asked that plaintiff be transferred back to HPHS.  Stacy Tr. 68-71.

presentation and a Jones New York suit, she would not get the job;  and that when she went to

the interview in June, 2001, and saw David Hodge and June Bernabucci, her anger and rage got

the better of her, so that she relived the miserable experience of having been told it would be

"unfair" to take David Hodge out of a position he had held for days, yet it was not "unfair" to

yank her out of the position she had performed excellently for four years.  LaPenna Affid. ¶¶42.

A reasonable jury could determine that the defendants' actions are responsible for the fact that

Janice LaPenna is not in that job through today, and into the future.  If defendants treated women

equally with men she would be.  If they did not favor a younger applicant over an older one she

would be.  If June Bernabucci had not retaliated against her for exercising her speech rights she

would be.


                                          RESPECTFULLY SUBMITTED,
                                          PLAINTIFF


                                          By   /s/
                                          Judith D. Meyer
                                          Fed Bar No.: CT04976
                                          152 Simsbury Road
                                          P.O. Box 451
                                          Avon, CT 06001-0451
                                          Tel. (860) 678-7711
                                          Fax (860) 677-6832
                                          e-mail: judithdmeyer@igc.org
                                          HER ATTORNEY


## **CERTIFICATION**

This is to certify that a copy of the foregoing was sent via first-class mail, postage prepaid, this

20th day of January, 2004, to the following counsel of record:

Joseph W. McQuade, ct12121
Kainen, Escalera & McHale, P.C.
21 Oak Street, Suite 601
Hartford, CT  06106

_____

Judith D. Meyer